IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM and THE UNIVERSITY OF TEXAS AT AUSTIN<br>　　　　Plaintiffs<br><br>vs.<br><br>3D SYSTEMS, INC.<br>　　　　Defendant | § § § § § § § § § § § | <br><br><br><br><br><br><br><br>Case No. A-10-CA-871-SS |
| 3D SYSTEMS, INC.<br>　　　Counterclaim-Plaintiff<br><br>VS.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM AND THE UNIVERSITY OF TEXAS AT AUSTIN<br>　　　Counter-Defendants | § § § § § § § § § § § | |

**APPENDIX TO PLAINTIFFS' AND COUNTER DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1)**

Respectfully submitted,

GREG ABBOTT
Attorney General

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation

RUTH R. HUGHS
Director of Defense Litigation

DAVID C. MATTAX
Chief, Financial Litigation Division

　　*/s/ Linda I. Shaunessy*
LINDA I. SHAUNESSY
State Bar No. 10382920
Assistant Attorney General
Financial Litigation Division
P.O. Box 12548
Austin, Texas  78711-2548
Telephone:  (512) 475-1652
Facsimile:  (512) 477-2348
linda.shaunessy@oag.state.tx.us
*Attorneys for Board of Regents of the*
*University of Texas System and*
*The University of Texas at Austin*

## INDEX

**TAB**                                                                                      **PAGE NO.**

A.     Cause No. D-1-GN-10-003599; Plaintiff's Original Petition w/exhibits.......... 000001

B.     Affidavit of Linda Shaunessy........................................... 000070

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing *Appendix to Plaintiffs' and Counter-Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)* was served on the following attorneys of record on this 6th day of December, 2010, as shown below:

Barry F. McNeil/Nicholas Even                Leslie C. Thorne
HAYNES AND BOONE, LLP                  HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700             600 Congress Avenue, Suite 1300
Dallas, Texas 75219                              Austin, TX 78701-3236


    */s/ Linda I. Shaunessy*
Linda I. Shaunessy

# Tab A

Filed
10 October 6 P2:33
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-10-003599

CAUSE NO. _____

| | | |
|---|---|---|
| BOARD OF REGENTS OF THE | § | IN THE DISTRICT COURT |
| UNIVERSITY OF TEXAS SYSTEM | § | |
| AND THE UNIVERSITY OF TEXAS | § | |
| AT AUSTIN | § | |
|     Plaintiffs | § | TRAVIS COUNTY, TEXAS |
| | § | |
| VS. | § | |
| | § | |
| 3D SYSTEMS, INC. | § | |
|     Defendant | § | ____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

The Board of Regents of The University of Texas System and The University of Texas at Austin (collectively, "UT"), represented by the Office of the Attorney General of the State of Texas, file this original petition complaining of 3D Systems, Inc. ("3D").

### A. DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190. Plaintiff seeks monetary damages in excess of $50,000.00.

### B. PARTIES

2.    Plaintiff, The Board of Regents of The University of Texas System, is an entity of the State of Texas. Its principal office is located in Austin, Travis County, Texas.

3.    Plaintiff, The University of Texas at Austin, is an entity of the State of Texas. Its principal office is located in Austin, Travis County, Texas.

4.    Defendant, 3D Systems, Inc., is a foreign corporation with its principal place of business in Rock Hill, York County, South Carolina. 3D Systems, Inc. can be served through its registered agent for service of process: Corporation Service Company, 1703 Laurel Street, Columbia, South Carolina, 29201.

### C.  JURISDICTION & VENUE

5.      This Court has jurisdiction over 3D because 3D engaged in acts which constitute doing business in Texas, including entering into a contract with UT in which elements of performance took place in Texas and paying royalty payment to UT.  *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041 & 17.042.

6.      Jurisdiction is proper in the District Court of Travis County as the amount in controversy is at least $50,000.00.

7.      Venue is proper in Travis County pursuant to Texas Education Code § 65.42 as this is an action to recover a debt owed to the Board of Regents of The University of Texas System and The University of Texas at Austin.  Venue is also proper in Travis County because a substantial part of the events or omissions giving rise to the claim occurred in Travis County.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 15.002(a)(1).

### D.  FACTS

8.      On December 3, 1987, the Board of Regents of The University of Texas System, on behalf of The University of Texas at Austin, entered into a License Agreement with 3D's predecessor-in-interest, Nova Automation Corporation ("Nova"), granting Nova an exclusive, worldwide royalty-bearing license to sell computer-controlled mechanized layered part generation systems utilizing patented and unpatented laser sintering technology[1] ("Systems") that UT had developed.   (A true and correct copy of this 1987 License Agreement is attached hereto as **Exhibit A**.)

--------

[1]  Laser sintering is a process in which a product is made by using a laser to superheat Nylon Materials in successive layers such that it molds and fuses into the desired shape of the product.

9.    Pursuant to Section 5.2 of the License Agreement Nova was obligated to pay UT a running royalty in the amount of four (4%) percent of all the licensee's net sales of the Systems. Pursuant to Section 5.6, Nova must provide quarterly reports on its gross production of the Systems, total sales, net sales, the calculation of royalties, and the total royalties due to UT.

10.    On March 3, 1992, the License Agreement was supplemented to memorialize Nova's name change to DTM Corporation and to clarify certain other terms and conditions. (A true and correct copy of this 1992 Supplement is attached hereto as **Exhibit B**.)

11.    The License Agreement was further amended on October 27, 1994, to address the acquisition by DTM Corporation of another competing patent. (A true and correct copy of this 1994 Amendment is attached hereto as **Exhibit C**.)

12.    An Amendment No. 2 to the License Agreement was entered into on February 28, 2003. Amendment No. 2 memorializes the assignment of the License Agreement from DTM Corporation to 3D on August 9-10, 2001, when 3D acquired DTM Corporation. (A true and correct copy of Amendment No. 2 is attached hereto as **Exhibit D**.)

13.    Amendment No. 2 states that unless expressly provided for in Amendment No. 2, all other conditions and provisions of the License Agreement remain in full force and effect. *See* paragraph 9 of the Therefore clauses of Amendment No. 2.

14.    Amendment No. 2 also obligates 3D to pay UT a running royalty on the gross sales of certain nylon materials that are used in the laser sintering process ("Nylon Materials"). The actual percentage is dependent on a number of variables, including the amount sold and offsets for different taxes paid. Section 5.6 of Amendment No. 2 requires 3D to provide UT with an annual royalty report. UT must pay up to $5,000 for the annual royalty report. UT has tendered a check in the amount of $5,000 to 3D. 3D has failed to send an annual royalty report to UT.

15.     3D continued to pay royalties to UT for the world-wide sale of the Systems from the effective date of the License Agreement and continued to pay royalties to UT for the world-wide sale of Nylon Materials from the effective date of Amendment No. 2 until December 23, 2008.

16.     On December 23, 2008, 3D sent to UT a letter stating that it did not owe and would no longer pay a royalty for Nylon Materials that were not sold in, exported from, nor imported into the United States.  (A true and correct copy of the December 23, 2008 letter is attached hereto as **Exhibit E**.)

17.     The December 23, 2008 letter also stated 3D's belief that it had overpaid UT for royalties on Nylon Materials since the effective date of Amendment No. 2.  3D alleged that its overpayment amounted to $765,815.70.  As a result, 3D said it would not be paying the royalties due, for either the Systems or Nylon Materials sales, until this overage was completely offset.

18.     UT responded on March 2, 2009 ("March 2009 letter"), stating that 3D was in default of its obligations under Section 5.9 of Amendment No. 2.  Further, because of 3D's repudiation of its obligation, UT gave 3D notice of default under Section 7.2 of the License Agreement.  UT demanded timely compliance with the terms of the License Agreement and Amendment No. 2.  (A true and correct copy of the March 2, 2009 letter is attached hereto as **Exhibit F**.)

19.     In the March 2009 letter, UT demanded that 3D timely comply with the audit requirements under Section 5.6 of the License Agreement and Section 8 of Amendment No. 2.

20.     In a further effort to resolve 3D's defaults, in March 2010, UT representatives went to 3D's South Carolina facility, but 3D refused to discuss the default with UT representatives.  3D has to date failed to comply with these obligations.

21.     Despite its demand and UT's efforts to resolve 3D's defaults, UT has not received any royalty payments for either the Systems or Nylon Materials sold by 3D, or the audited sales and royalty reports required by Section 8 of Amendment No. 2.

22.     3D has failed to pay UT $558,472.84 for all royalties for gross sales of Nylon Materials and the Systems as of March 31, 2010.

## E.  FIRST CAUSE OF ACTION
### Breach of License Agreement - Systems

23.     UT incorporates herein by reference all of the above paragraphs.

24.     The terms of the License Agreement impose a contractual obligation on 3D to pay UT a running royalty for all the Systems sold under the contract.  This obligation is due and owing within 60 days of the fiscal quarter in which the Systems were sold.  *See* Section 5.6 of the License Agreement.

25.     The terms of the License Agreement and Amendment No. 2 also impose a contractual obligation on 3D to provide sales and royalty reports for all the Systems sold on a quarterly basis and an independently-audited royalty report on an annual basis.

26.     As a result of 3D's uncured breach of the License Agreement and failure to provide required documentation as of March 31, 2010, UT has suffered damages in an amount of at least $426,889.31 in offset monies owed.  (A true and correct copy of 3D's June 1, 2010 royalty offset statement is attached hereto as **Exhibit G**.)  Since 3D has a continuing obligation as it continues to sell the Systems, UT anticipates that it will incur increasing damages as a result of 3D's breach.

## F.  SECOND CAUSE OF ACTION
### Breach of License Agreement - Nylon Materials

27.     UT incorporates herein by reference all of the above paragraphs.

28.     The terms of the License Agreement and Amendment No. 2 impose a contractual obligation on 3D to pay UT a running royalty for gross sales of all Nylon Materials sold under the contract.

29.     Gross Sales Price, as stated in Amendment No. 2 at Section 5.10, means the invoice price for any individually sold Nylon Materials, less any tax or governmental charged levied on the sale.

30.     Nylon Materials means the powders for use in laser sintering containing nylon polyamide or glass-filled nylon polyamide marked as "DuraForm PA" and "DuraForm GF". *See* Section 5.11 of Amendment No. 2.

31.     The payment related to gross sales of Nylon Materials is due and owing within 60 days of the fiscal quarter in which the Nylon Materials was sold. *See* Section 5.9 of Amendment No. 2 (**Exhibit D**) and Section 5.6 of the License Agreement (**Exhibit A**.)

32.     The duration of this payment obligation for gross sales of Nylon Materials is set in Section 5.14 of Amendment No. 2 as the expiration of the last of the listed undisputed nylon patents.

33.     3D has been informed on numerous occasions of its duties under the License Agreement and Amendment No. 2 regarding the sale of Nylon Materials, and that UT considers 3D to be in default of its obligations. To date 3D has failed to remedy these breaches of the agreement. As a result of 3D's uncured breach of the License Agreement and failure to provide required documentation as of March 31, 2010, UT has suffered damages of at least $131,583.53 in offset monies owed. *See* **Exhibit G**. As a result of 3D's failure to provide required documentation as to gross sales of Nylon Materials, UT is unable to calculate the amount that 3D should have paid for unreported sales of Nylon Materials since December 23, 2008. However, UT estimates the damages to exceed several hundred thousands dollars. Since these requirements are continuing obligations of 3D, UT anticipates that it will incur increasing damages as a result of 3D's continuous breaches.

## G.   THIRD CAUSE OF ACTION
### Improper Withholding

34.     UT incorporates herein by reference all of the above paragraphs.

35.     Nowhere in the License Agreement, the Supplement, the 1994 Amendment, or Amendment No. 2 is the withholding of monies owed to UT by 3D allowed.  Section 5 of the License Agreement makes it clear that 3D is under a continuing obligation to pay royalties to UT within sixty (60) days of their becoming due and owing.  This requirement was not altered by any of the succeeding agreements.

36.     Section 5.8 of the License Agreement is clear and unambiguous as to how payments are to be made:  "All amounts payable hereunder by Licensee shall be payable in United States funds without deductions of any kind other than those permitted under this Agreement."

37.     3D has been informed on numerous occasions of its duties to pay under the License Agreement, and that UT considers 3D to be in default of its obligations by withholding funds due and owing to UT.  3D has to date failed to comply with these obligations.  As a result of 3D's uncured breach of the License Agreement, UT has suffered damages in an amount of at least $558,472.84 in unpaid royalties for the Systems and Nylon Materials sold.  *See* **Exhibit G**.  3D has informed UT that additional monies in the amount of $207,342.86 will be withheld from monies that are due and owing to UT.  **Exhibit G.**  Due to 3D's failure to provide adequate documentation, it is possible that this sum has already been withheld.

## H.  CONDITIONS PRECEDENT

38.     All conditions precedent required of UT have been performed or have occurred.

## I.  ATTORNEY FEES

39.     UT seeks an award of reasonable attorney fees. *See* Tex. Gov't. Code Ann. § 402.006.

## J.  CHOICE OF LAW

40.     3D agreed, in Section 14.3 of the License Agreement, that the agreement would be construed and enforced in accordance with the laws of the State of Texas.

## K.  DEMAND FOR JURY TRIAL

41.     Plaintiffs hereby demand a trial by jury of all issues so triable in this action.


## PRAYER

WHEREFORE, Plaintiffs, The Board of Regents of The University of Texas System and The University of Texas at Austin, respectfully request that Defendant 3D Systems, Inc. be cited to appear and answer, and that on final trial Plaintiff have the following:


A.     Provision of independently audited sales and royalty reporting for all sales of layered part generation systems and Nylon Materials pursuant to sections 5.6 of the License Agreement and Amendment No. 2;

B.     Provision of independently audited sales and royalty reporting for all sales of layered part generation systems and Nylon Materials pursuant to Tex. Rule of Civ. Proc. 172;

C.     A monetary award in an amount of at least $558,472.84 as of March 31, 2010, for improperly withheld payments of royalties due and owing on sales of the Systems and Nylon Materials;

D.     After an auditing has been conducted, an award of damages for monies owed to date on the gross sales of Nylon Materials, wherever sold;

E.     An order commanding 3D to pay royalties in the future according to the schedule set forth in the License Agreement for all Nylon Materials sales, wherever sold;

F.     An assessment of pre-judgment and post-judgment interest on the damages determined;

G.     An award of Plaintiffs' costs and attorneys fees; and

H.     Such other and further relief as the Court deems appropriate.

Respectfully submitted,

GREG ABBOTT
Attorney General

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation

RUTH R. HUGHS
Director of Defense Litigation

DAVID C. MATTAX
Chief, Financial Litigation Division


LINDA I. SHAUNESSY
State Bar No. 10382920
Assistant Attorney General
Financial Litigation Division
P.O. Box 12548
Austin, Texas  78711-2548
Telephone:  (512) 475-1652
Facsimile:  (512) 477-2348
linda.shaunessy@oag.state.tx.us

**Attorneys for Board of Regents of the University of
Texas System and The University of Texas System**

## PATENT LICENSE AGREEMENT

THIS AGREEMENT is made by and between the BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM ("BOARD"), an agency of the State of Texas, whose address is 201 West 7th Street, Austin, Texas 78701, on behalf of its component, The University of Texas at Austin, ("UNIVERSITY") and NOVA AUTOMATION CORPORATION ("LICENSEE"), a Texas corporation, having an office at 1515 Capital of Texas Highway South, Austin, Texas, 78746.

### W I T N E S S E T H:

Whereas BOARD owns certain PATENT RIGHTS relating to methods and apparatus for Layered Part Generation Using Laser Sintering; and

Whereas BOARD also owns certain unpatented technology for Layered Part Generation Using Laser Sintering; and

Whereas BOARD wishes to have LICENSED SUBJECT MATTER developed and used for the benefit of the inventor, UNIVERSITY, and the public as outlined in the Intellectual Property Policy and Guidelines promulgated by the aforementioned BOARD; and

Whereas LICENSEE wishes to obtain a license subject to pre-existing rights or licenses, if any, under BOARD'S PATENT RIGHTS or unpatented technology; and

Whereas BOARD wishes to grant a license to LICENSEE, subject to the terms and conditions stated herein;

NOW, THEREFORE, in consideration of the mutual covenants and premises herein contained, the parties hereto agree as follows:

1

000010



## I.   EFFECTIVE DATE

This agreement shall be effective December 3, 1987, subject to approval by BOARD.

## II.   DEFINITIONS

As used in this Agreement, the following terms shall have the meanings indicated:

2.1   LICENSED SUBJECT MATTER shall mean all information contained in either PATENT RIGHTS or TECHNOLOGY RIGHTS.

2.2   PATENT RIGHTS shall mean BOARD'S rights in information covered at any time by United States Patent Application Serial Number 920,580, filed October 17, 1986, and any division, continuation, continuation-in-part, reissue or re-examination thereof, and any letters patent that may be issued thereon, or any foreign counterpart thereof.

2.3   TECHNOLOGY RIGHTS shall mean unpatented technology, technical information, design data, and other information owned by BOARD which relates to methods and/or apparatus for layered part generation using laser sintering to the extent necessary for practicing the inventions or discoveries covered by PATENT RIGHTS. TECHNOLOGY RIGHTS shall include without limitation all information, know-how, process, procedures, methods, protocols, formulas, techniques, software, designs, drawings, data and other valuable technical information not in the public domain at the time of disclosure by BOARD to LICENSEE.

2.4   SALE shall mean any transfer or disposition to a party other than LICENSEE or a sublicensee hereunder of LICENSED SUBJECT MATTER in exchange for value received.

2

000011

2.5   NET SALES shall mean LICENSEE's gross receipts from SALE(S) of products covered by LICENSED SUBJECT MATTER, less any deduction for commissions, trade discounts, returns, freight, taxes or government tariffs.

### III. WARRANTY; SUPERIOR RIGHTS

3.1   Except for the rights, if any, of the Government of the United States, as referenced in paragraph 3.2 below, BOARD represents and warrants that it is the owner of the entire right, title, and interest in and to PATENT RIGHTS and TECHNOLOGY RIGHTS, that it has the sole right to grant licenses under LICENSED SUBJECT MATTER and that it has not granted licenses thereunder to any other person or entity.

3.2   LICENSEE understands that the PATENT RIGHTS and TECHNOLOGY RIGHTS licensed hereunder may have been developed under a funding agreement with the Government of the United States of America and that the Government may have certain rights relative thereto.   This Agreement is explicitly made subject to the Government's rights, if any, under any such agreement.   To the extent that there is a conflict between any such funding agreement, and this Agreement, the terms of such funding agreement shall prevail.

### IV. LICENSE

4.1   BOARD hereby grants to LICENSEE an exclusive, worldwide royalty-bearing license (except as provided under Paragraph 3.2 and 4.4 hereof) to make, have made, use or sell LICENSED SUBJECT MATTER.

3

000012

4.2  LICENSEE shall have the right to grant sublicenses consistent with this Agreement, provided that LICENSEE shall be responsible for the operations of its sublicensee(s) relevant to this Agreement as if such operations were carried out by LICENSEE. However, LICENSEE shall not be obligated to make royalty payments to BOARD on income from its sublicenses until the receipt by LICENSEE of such royalty payments from its sublicensee(s).  Any sublicense granted hereunder shall, by its terms, not extend beyond the term of this Agreement.  If this Agreement is earlier terminated pursuant to paragraph 7.2, all sublicenses then in effect shall revert to BOARD as licensor, and BOARD shall have no further obligation to account to LICENSEE for royalties received thereunder; however, any such royalties from sublicenses applicable to the period prior to termination shall belong to LICENSEE. LICENSEE further agrees to deliver to BOARD a true and correct copy of each sublicense granted by LICENSEE, and any modification or termination thereof, within thirty (30) days after execution, modification, or termination, as applicable.  BOARD shall have the right of consent to the terms and conditions of any sublicense; however, such consent shall not be unreasonably withheld. BOARD shall exercise its right of consent within sixty (60) days of receipt by UNIVERSITY or BOARD of any proposed sublicense. Upon termination of this Agreement, any and all existing sublicense rights granted by LICENSEE shall automatically revert to BOARD.

4.3  BOARD specifically retains the right for itself and its component institutions to:

(a) Publish the general scientific findings from research related to LICENSED SUBJECT MATTER; and

4

(b) Use any information contained in LICENSED SUBJECT MATTER for research, teaching, and other educational purposes.

4.4 BOARD shall have the right at any time after the date of this Agreement to terminate the license granted herein if LICENSEE within ninety days after written notice from BOARD of termination fails to provide written evidence that it has commercialized or is actively attempting to commercialize LICENSED SUBJECT MATTER. LICENSEE further agrees to use its best efforts to produce and demonstrate a working commercial prototype adapted to practice LICENSED SUBJECT MATTER within eighteen (18) months from the date of this Agreement.

4.5 With respect to any foreign operations of LICENSEE, BOARD shall have the right at any time after December 31, 1997 to terminate the license granted herein in any foreign national political jurisdiction if LICENSEE, within one hundred eighty (180) days after written notice from BOARD of such intended termination, fails to provide written evidence to BOARD that it has commercialized or is actively attempting to commercialize LICENSED SUBJECT MATTER in that foreign jurisdiction.

4.6 Evidence provided by LICENSEE that it has an ongoing and active research, development, manufacturing, marketing or licensing program as appropriate, directed toward production and sale of products within LICENSED SUBJECT MATTER shall be deemed satisfactory evidence of such an attempt to commercialize.

4.7 The exercise of the license granted to LICENSEE under this Agreement shall be conditioned on the issuance of stock to BOARD as required by paragraph 6.1.

000014

## V. PAYMENTS AND REPORTS

5.1  Within one (1) year following execution of this Agreement LICENSEE will reimburse BOARD for reasonable attorneys' fees and expenses incurred by BOARD in preparing, filing and prosecuting patent application serial number 920,580, filed October 17, 1986, up to a maximum of Fifteen Thousand ($15,000.00) Dollars. BOARD shall control the preparation and prosecution of all patent applications directed to inventions covered by this license, and BOARD shall decide whether or not to file patent applications in the United States and shall notify LICENSEE of such decision. LICENSEE shall also reimburse BOARD for the reasonable costs of all additional U. S. filings if LICENSEE elects to include claimed subject matter of such U. S. patent application(s) within the scope of the license.  LICENSEE may, however, credit one half of sums paid to BOARD hereunder for reimbursement of fees and expenses for the additional U. S. patent applications against royalties due to BOARD under Paragraph 5.2 below.  Such credit shall be in addition to the waiver provided under Paragraph 5.2. LICENSEE shall have the right to elect whether or not to file foreign patent applications and LICENSEE will pay all fees and expenses associated with the filing, prosecution and maintenance of such foreign applications with no credit against royalties.

5.2  LICENSEE will pay BOARD a running royalty in the amount of four percent (4%) of LICENSEE'S NET SALES.  BOARD hereby agrees to waive one half the amount of royalty otherwise due on LICENSEE'S first $300,000 of NET SALES provided that LICENSEE has otherwise fully complied with this agreement at the time such royalty is due.

6

5.3  Any UNIVERSITY research sponsored by LICENSEE shall be negotiated with UNIVERSITY in accordance with BOARD's usual research agreement procedures.

5.4  LICENSEE will, in exchange for the rights granted hereunder, within one (1) year from the date of the execution of this Agreement, demonstrate to the satisfaction of BOARD that it has raised Three Hundred Thousand Dollars ($300,000) in capital financing.  At LICENSEE's request, BOARD may in its discretion extend the period to raise the Three Hundred Thousand Dollars ($300,000) in capital financing for an additional period of time not to exceed 180 days.  If LICENSEE fails to demonstrate timely to the BOARD'S satisfaction that it has raised the requisite capital, BOARD shall have the right to terminate this Agreement.

5.5  If any sublicenses are granted by LICENSEE pursuant to paragraph 4.2, BOARD will receive a percentage of the gross receipts received by LICENSEE from any sublicensees in an amount of not less than four percent (4%) nor more than fifty percent (50%), the exact percentage of gross receipts to be negotiated in a timely fashion between BOARD and LICENSEE at the time BOARD exercises its right of consent to the sublicensee under paragraph 4.2.  Among the factors to be taken into consideration in negotiating the sublicense fee will be (a) whether LICENSEE merely functions as a broker; (b) whether LICENSEE manufactures the licensed products to be sold by the sublicensee; (c) the extent of LICENSEE's investment in developing the sublicensed product.

5.6  Within sixty (60) days after March 31, June 30, September 30, and December 31, LICENSEE shall deliver to BOARD a true

7

and accurate report, giving such particulars of the business conducted by LICENSEE and its sublicensees, if any exist, during the preceding three (3) calendar months as are pertinent to an account for payments hereunder. Such report shall include at least (a) the quantities of LICENSED SUBJECT MATTER that it has produced; (b) the total SALES, (c) the NET SALES, (d) the calculation of royalties on NET SALES; and (e) the total royalties so computed and due BOARD. Simultaneously with the delivery of each such report, LICENSEE shall pay to BOARD the amount, if any, due for the period of such report. If no payments are due, it shall be so reported. At LICENSEE's request and for good cause shown, BOARD may in its discretion permit LICENSEE to defer payment of current royalties due BOARD until the next quarterly reporting period.

5.7 Upon the request of BOARD, but not more often than once per calendar year, LICENSEE shall deliver to BOARD a written report as to LICENSEE's efforts and accomplishment during the preceding year in commercializing LICENSED SUBJECT MATTER and its commercialization plans for the upcoming year.

5.8 All amounts payable hereunder by LICENSEE shall be payable in United States funds without deductions of any kind other than those permitted under this Agreement. Royalty checks shall be made payable to BOARD OF REGENTS, The University of Texas System and shall be mailed to the Office of Asset Management, 210 West Sixth Street, Austin, Texas 78701.

000017

## VI. COMMON STOCK; EQUITY OWNERSHIP

6.1 In consideration of the rights granted to LICENSEE by BOARD in this Agreement, LICENSEE agrees to issue 20% of its common stock to BOARD with pre-emptive rights. Such shares shall be fully paid and non-assessable.

6.2 BOARD shall have the right to name directors on the board of directors of LICENSEE in proportion to the number of shares held by BOARD relative to the total number of issued shares, provided, that BOARD shall always have the right to elect at least one seat on LICENSEE's board of directors.

## VII. TERM AND TERMINATION

7.1 Subject to the provisions of Paragraph 7.2, the Term of this Agreement shall extend from the Effective Date set forth above for a term of seventeen (17) years or until the expiration date of all patents under PATENT RIGHTS, whichever occurs last.

7.2 The license and right to sublicense granted by BOARD to LICENSEE in this Agreement will earlier terminate:

    (a) Automatically if LICENSEE shall become bankrupt or insolvent and/or if the business of LICENSEE shall be placed in the hands of a receiver, assignee, or trustee, whether by voluntary act of LICENSEE or otherwise and all rights of LICENSEE shall immediately revert to BOARD and all rights of any sublicensees shall survive, but the obligations of such sublicensees will automatically accrue to the benefit of BOARD;

9

(b)  If either party hereto shall breach or default on any material obligation under this Agreement.  However, termination of the Agreement shall be avoided if, within ninety (90) days after receipt of written notice of breach or default, the party in default cures the breach and notifies the other party in writing of the manner of such cure.

(c) Under the provisions of Paragraph 4.4 if invoked.

(d) Under the provisions of Paragraph 4.5 if invoked.

(e) Under the provisions of Paragraph 5.4 if invoked.

7.3  Upon termination of this Agreement for any cause, nothing herein shall be construed to release either party of any obligation matured prior to the effective date of such termination, and LICENSEE may, with BOARD'S written consent, after the effective date of such termination, sell any LICENSED SUBJECT MATTER in the possession of LICENSEE, its agents or bailees at the date of termination, provided that it pays BOARD royalties thereon as provided in this Agreement when sold.

## VIII. INFRINGEMENT

8.1  LICENSEE shall have the obligation to enforce any patent licensed hereunder against substantial infringement by third parties.  If LICENSEE elects to bring suit for infringement, then the running royalty will apply to all amounts recovered by LICENSEE, excluding LICENSEE's legal expenses.  If LICENSEE elects not to bring suit and thereafter BOARD elects to bring suit, LICENSEE must join in the suit and must share fifty percent (50%) of the expenses in order for LICENSEE to maintain its exclusive license under this agreement.  If BOARD elects to bring suit,

10

BOARD shall control the suit and LICENSEE shall receive fifty percent (50%) of any net recovery to BOARD after legal expenses.

8.2 In any suit or dispute involving alleged patent infringement, the parties to this Agreement shall cooperate fully including making available all relevant personnel, records, papers, information, samples, specimens, and the like which are in their possession.

## IX. ASSIGNMENT

This Agreement may not be assigned by either party hereto without the prior written consent of the other party hereto which consent shall not be unreasonably withheld.

## X. PATENT MARKING

LICENSEE agrees to mark permanently and legibly all products and documentation manufactured or sold by it under this Agreement with such patent notice as may be permitted or required under Title 35, United States Code.

## XI. INDEMNIFICATION

LICENSEE shall hold harmless and indemnify BOARD, UNIVERSITY, their Regents, officers, employees and agents from and against any claims, demands, or causes of action whatsoever, caused by, arising out of, or resulting from the exercise or practice of the license granted hereunder by LICENSEE or its officers, employees, agents or representatives, including without limitation those arising on account of any injury or death of persons or damage to property.

000020

## XII. USE OF BOARD AND COMPONENT'S NAME

LICENSEE shall not use the name of UNIVERSITY, SYSTEM, or BOARD for commercial purposes (other than providing disclosure to potential investors to the extent required by law) without the express written consent of the Office of General Counsel for The University of Texas System or another individual designated by the Office of the Chancellor, which consent shall not be unreasonably withheld.

## XIII.  CONFIDENTIAL INFORMATION

13.1 BOARD and LICENSEE each agree that all information contained in documents marked "confidential" which are forwarded to one by the other shall be received in strict confidence, used only for the purposes of this Agreement, and not disclosed by the recipient (except as required by law or by court order), its' agents or employees without the prior written consent of the other unless such information (a) was in the public domain at the time of disclosure, (b) later became part of the public domain through no act or omission of the recipient, its' employees, agents, successors or assigns, (c) was lawfully disclosed to the recipient party by third party having the right to disclose it, (d) was already known by the recipient at the time of disclosure, (e) was independently developed, or (f) is required to be submitted to a government agency pursuant to any preexisting obligation.

13.2 Each party's obligation of confidence hereunder shall be fulfilled by using at least the same degree of care with the other party's confidential information it used to protect its own confidential information.  This obligation shall exist while this

12

000021

agreement is in force and for a period of three (3) years there-after.

## XIV.  GENERAL

14.1 This Agreement constitutes the entire and only agreement between the parties for LICENSED SUBJECT MATTER and all other prior negotiations, representations, agreements, and understandings are superseded hereby.  No agreements altering or supplementing the terms hereof may be made except by means of a written document signed by the duly authorized representatives of the parties hereto.

14.2 Any notice required by this Agreement shall be given by prepaid, first class, certified mail, return receipt requested, addressed in the case of BOARD to:

> BOARD OF REGENTS
> The University of Texas System
> 201 West 7th Street
> Austin, Texas   78701
> ATTENTION:  System Intellectual Property
>                        Office

or in the case of LICENSEE to:

> NOVA AUTOMATION CORP.
> 1515 Capital of Texas Highway S.
> Austin, Texas   78746

or such other addresses as may be given from time to time under the terms of this notice provision.

14.3 This Agreement shall be construed and enforced in accordance with the laws of the United States of America and of the State of Texas.

13

14.4 Failure of either party hereto to enforce a right under this Agreement shall not act as a waiver of that right or the ability to later assert that right relative to the particular situation involved.

14.5 Headings included herein are for convenience only and shall not be used to construe this Agreement.

14.6 If any provision of this Agreement shall be found by a court to be void, invalid or unenforceable, the same shall be reformed to comply with applicable law or stricken if not so conformable, so as not to affect the validity or enforceability of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this AGREEMENT.

ATTEST:

By _____
Arthur H. Dilly
Executive Secretary

APPROVED AS TO FORM:

By _____
Michael H. Corley
Office of General Counsel

BOARD OF REGENTS OF THE
UNIVERSITY OF TEXAS SYSTEM

By _____
Michael E. Patrick
Executive Vice Chancellor
for Asset Management

APPROVED AS TO CONTENT:

By _____
William H. Cunningham
President, THE UNIVERSITY OF
TEXAS AT AUSTIN

NOVA AUTOMATION CORPORATION

By _____
President

14

000023

## SUPPLEMENT

To the PATENT LICENSE AGREEMENT between the BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM ("BOARD") and NOVA AUTOMATION CORPORATION ("NAC") of December 3, 1987. Definitions of the PATENT LICENSE AGREEMENT shall apply to this SUPPLEMENT.

WHEREAS pursuant to the above identified Agreement, BOARD granted NAC a license to certain Patent Rights and Technology Rights, and provided for the payment of royalties to BOARD by NAC; and

WHEREAS the terms of said Agreement do not deal in specifics with the internal use in a Service Bureau of laser sintering apparatus, methods and materials ("LSA") to make parts for third parties or leasing such apparatus; and

WHEREAS both parties have reach mutual understandings and agreements on the issues of how royalty should be calculated on different LSA systems and materials sold, leased and/or used by Licensee and on other matters and now wish to incorporate such understandings and agreements as part of said Agreement; and

WHEREAS on February 27, 1989, the corporate name of the Licensee NOVA AUTOMATION CORPORATION, was changed to DTM CORPORATION;

NOW, THEREFORE, BOARD and DTM CORPORATION ("DTM"), agree to the understandings, terms and provisions specified below and to incorporate this SUPPLEMENT and make it part of the above identified PATENT LICENSE AGREEMENT.



EXHIBIT

B

000024

1.      In Article IV (LICENSE), add the following Section 4.1(a):

4.1(a).      If during the term of the PATENT LICENSE AGREEMENT faculty or students of the University of Texas at Austin make inventions or develop technology pursuant to research sponsored by another party and such inventions or technology are assigned to BOARD and reasonably relate to LICENSED SUBJECT MATTER of the PATENT LICENSE AGREEMENT, then to the extent BOARD has the right to do so and subject to any restrictions, reservations, limitations and licenses contained in any agreement between BOARD and any other party sponsoring such research, BOARD agrees to grant DTM an option to an exclusive royalty-bearing license to such inventions or technology rights for use in the selective laser sintering field of use.

Said option shall be at no cost to DTM for three (3) months from the date of receipt by DTM of a written notice from BOARD describing such invention or technology.  Upon written request, DTM may obtain a three (3) month extension of said option but in consideration for such extension DTM shall pay either Ten Thousand Dollars ($10,000) or the expenses of preparing and filing any patent application covering such invention.  If DTM makes said payment, then BOARD shall pay the expenses of preparing and filing a patent application covering such invention up to a maximum of $10,000.  During said option period or its extension, DTM must give a written notice to BOARD if it elects to exercise its option to obtain said license.

2.      In Article V (PAYMENTS AND REPORTS), add the following Section 5.2(a):

5.2(a).      The running royalty which LICENSEE is obligated to pay BOARD pursuant to Section 5.2 shall be calculated on various laser sintering products and on materials as more specifically provided below:

- 2 -

(i)       For each SLS 125 unit which LICENSEE places into its internal DTM Service Bureau use, royalty shall be calculated on the preestablished price for each unit of Two Hundred Twenty Five Thousand Dollars ($225,000).

(ii)     For each LSA unit other than the SLS125 which LICENSEE places into its internal DTM Service Bureau use or is leased to a third party, royalty shall be calculated initially on the preestablished price for each unit of Three Hundred Seventy Thousand Dollars ($370,000), less any deductions as specified in the definition of NET SALES. After six (6) LSA units have been sold to third parties, the Average NET SALES price of each of said six (6) units shall be calculated by adding the NET SALES prices of the six (6) units and dividing the sum by six (6). The Average NET SALES price shall be used to recalculate royalty on said previously sold six units. If the Average NET SALES price of each unit is higher than Three Hundred Seventy Thousand Dollars ($370,000), then LICENSEE shall pay BOARD the royalty specified in Section 5.2 on the difference. If the Average NET SALES price is lower than Three Hundred Seventy Thousand Dollars ($370,000), then the difference multiplied by the royalty percent specified in Section 5.2 shall be credited to LICENSEE against the next royalty payment. Royalty on each LSA unit thereafter placed into the DTM Service Bureau use or leased to a third party shall b calculated on the Average NET SALES price of the latest six (6) units sold, on a rolling basis.

Royalty on LSA units sold shall be calculated on the NET SALES price of each unit as provided in Section 5.2.

- 3 -

000026

(iii)    If during the first eighteen (18) months following the first sale of LSA (other than the sale of Beta units), more than twenty five percent (25%) of all LSA units placed in service (sold, leased or placed in any service bureaus) are placed in the DTM Service Bureaus, then the Alternative Royalty Calculation Method shall be used to determine royalty for those LSA units which are placed in the DTM Service Bureaus during the following twenty four (24) month period.

Thereafter, if during any twenty four (24) month period more than twenty five percent (25%) of all LSA units placed in service (sold, leased or placed in any service bureaus) are placed in the DTM Service Bureaus, then the Alternative Royalty Calculation Method shall be used to determine royalty for the LSA units which are placed in the DTM Service Bureaus during the following twenty four (24) month period.  If, however, during any twenty four (24) month period twenty five percent (25%) or less of all LSA units placed in service (sold, leased or placed in any service bureaus) are placed in the DTM Service Bureaus, then the provisions of Section 5.2(a)(ii) shall be used to calculate royalty for LSA units which are placed in the DTM Service Bureaus during the following twenty four (24) month period.

Alternative Royalty Calculation Method - LICENSEE shall determine Net Income from DTM Service Bureau operation and also determine the percentage of LSA units which were placed in the DTM Service Bureaus service during a particular twenty four (24) month period, based on the total number of LSA units that were in

- 4 -

000027

service anywhere during said period. The Net Income shall be multiplied by said percentage and the result shall constitute Net Sales based on which the royalty specified in Section 5.2 will be calculated. Royalty payments shall be made pursuant to Section 5.6.

Net Income shall mean revenues generated form the use of all LSA units less expenses associated with their operation including cost of labor, materials used for making parts, repairs and overhead under generally accepted accounting principles.

Once a method of royalty calculation for the specific LSA unit is established (pursuant to Section 5.2(a)(ii) or Alternative Royalty Calculation Method), that method will continue to be used for calculating royalty for the specific unit during the entire commercial life of that unit. However, if a unit, which was initially placed in the DTM Service Bureau and royalty on that unit was calculated by the Alternative Royalty Calculation Method, is thereafter sold, DTM shall pay royalty to BOARD on the sale of such unit pursuant to Section 5.2. Furthermore, if any unit for which royalty was originally paid pursuant to Section 5.2 is thereafter sold back to DTM or, if originally leased, returned to DTM and DTM refurbishes or upgrades such unit and then sells it or places it in DTM Service Bureau, DTM shall pay royalty to BOARD on such sale or use pursuant to Section 5.2 or 5.2(a), whichever is applicable.

(iv)     LICENSEE shall pay royalty on NET SALES of materials which are specifically covered as such by claims of a patent application or a

- 5 -

000028

patent assigned to BOARD within the scope of PATENT RIGHTS.
If a patent application with such claims is abandoned and not
continued in another application, no royalty shall be due on a
material within the scope of such abandoned subject matter after the
date of abandonment.

3.    In Article VII (INFRINGEMENT), add the following Section 8.1(a):

8.1(a).    In the event that LICENSEE determines that it must obtain a license
to practice under a third party patent in order to avoid patent infringement in making, using
or selling apparatus pursuant to the PATENT LICENSE AGREEMENT or in having such
apparatus used by its customers, or LICENSEE determines that it needs a license to use a
third party technology to maintain the commercial and competitive viability of its apparatus
in the market place, BOARD agrees to negotiate in good faith with LICENSEE a reduction,
if appropriate, in the royalty rate specified in Section 5.2 of the PATENT LICENSE
AGREEMENT.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to
execute this SUPPLEMENT to the PATENT LICENSE AGREEMENT.

Approved as to Content:

William H. Cunningham
President
The University of Texas
at Austin

BOARD OF REGENTS OF THE
UNIVERSITY OF TEXAS SYSTEM


By _____


DTM CORPORATION


By _____    3/30/92
John S. Murchison, President & CEO

- 6 -

## AMENDMENT TO PATENT LICENSE AGREEMENT

THIS AMENDMENT TO PATENT LICENSE AGREEMENT (this *"Amendment"*) dated as of October 27, 1994 is made by and between the Board of Regents, The University of Texas System (*"Board"*), an agency of the State of Texas, on behalf of its component, The University of Texas at Austin (*"University"*), and DTM Corporation, a Texas corporation formerly named Nova Automation Corporation (*"Licensee"*).

### RECITALS:

WHEREAS, the Board and DTM are parties to the Patent License Agreement effective December 3, 1987, as supplemented by the Supplement executed by Licensee on March 20, 1992 between such parties (collectively, the *"Patent License Agreement"*);

WHEREAS, pursuant to Article V of the Patent License Agreement, Licensee is obligated to pay certain royalties to the Board within 60 days after each March 31, June 30, September 30 and December 31 during the term of the Patent License Agreement based on Licensee's Net Sales, as defined in the Patent License Agreement, during the three calendar months preceding each such date;

WHEREAS, Licensee desires to defer a portion of its royalty payments under Article V of the Patent License Agreement;

WHEREAS, Licensee incurred out-of-pocket expenses of $317,606.59 in connection with its acquisition of United States Patent No. 4,247,508 (the *"Housholder Patent"*), which patent Licensee determined it needed to (i) avoid patent infringement in making, using and selling apparatus pursuant to the Patent License Agreement or in having its customers use such apparatus and (ii) maintain commercial and competitive viability of such apparatus in the market place;

WHEREAS, pursuant to the principles behind Section 8.1(a) of the Patent License Agreement, Licensee desires a reduction in its royalty payments under the Patent License Agreement in connection with its acquisition of the Housholder Patent;

### AGREEMENT:

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Deferral of Royalty Payments.

      (a)  Licensee shall pay 25% of the amount of each royalty payment due with respect to the three month periods ending on March 31, June 30, September 30 and December

EXHIBIT

C

31 of 1992, 1993 and 1994 in accordance with the Patent License Agreement. All royalty payments heretofore made by Licensee to the Board with respect to such periods shall be applied to satisfy Licensee's obligations under the preceding sentence on the first in first out basis, and, subject to Section 2(a) of this Amendment, Licensee shall pay its remaining obligations as of the date hereof under the preceding sentence upon execution of this Amendment.

(b)     Licensee shall defer until January 1, 1995 75% of each royalty payment due with respect to the three month periods ending on March 31, June 30, September 30 and December 31 of 1992, 1993 and 1994. The total amount of deferred payments shall be paid by Licensee to the Board in eight equal installments, with the first installment due on January 1, 1995 and the remaining installments due on each April 1, July 1, October 1 and January 1 thereafter until the total amount of deferred payments is paid in full.

(c)     Each deferred payment shall bear interest at a rate of 12.3% per annum from the time such payment is originally due under Section 5.6 of the Patent License Agreement until such time paid to the Board pursuant to Section 1(b) of this Amendment. Interest shall be paid by Licensee to the Board on each date specified in Section 1(b) of this Amendment in amounts equal to the interest accrued with respect to the deferred royalty payment(s) being repaid at such date. Deferred royalty payments shall be deemed to be repaid on the first in first out basis.

2.     Housholder Patent.

(a)     Licensee shall be entitled to a credit of $158,803.29 (the "*Housholder Credit*"), representing 50% of Licensee's expenses relating to the acquisition of the Housholder Patent, against all royalties payments due by Licensee to the Board under the Patent Licensee Agreement and this Amendment. Until the balance of the Housholder Credit shall be reduced to zero, such credit shall be applied: first, to satisfy Licensee's obligations as of the date hereof under Section 1(b) of this Amendment; second, to satisfy Licensee's obligations after the date hereof under Section 1(b) of this Amendment; third, to satisfy Licensee's obligations under Section 1(c) of this Amendment; and fourth, to satisfy all other obligations of Licensee to pay royalties to the Board under the Patent License Agreement.

(b)     Licensee hereby grants to the Board (i) a transferable, worldwide license to make, have made, use and/or sell and to license others to do so (such license to be subject to any licenses heretofore granted by Licensee) under all of Licensee's rights under the Housholder Patent: *provided, however,* that neither the Board nor any assignee of the Board shall be entitled to grant sublicenses with respect to the Housholder Patent under such license unless and until Licensee shall (i) seek protection from its creditors under federal bankruptcy laws or liquidate or dissolve; or, (ii) the Patent License Agreement is terminated.

3.     Research and Development Funding. Licensee has notified the Board of Licensee's intent to suspend funding to University for research and development relating to selective laser sintering technology. Licensee agrees that if it resumes funding to any university,

-2-

college or educational institution for research and development relating to selective laser sintering technology, University will receive priority status for such funding.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Amendment as of the date first written above.

**BOARD OF REGENTS OF THE
UNIVERSITY OF TEXAS SYSTEM**

Approved as to Content:

By: _Steph C. Mont_
Name: STEPHEN A. MONTI
Title: VICE PROVOST

By: _Ray Farabee_
Name: Ray Farabee
Title: Vice Chancellor & General Counsel

Approved as to Form:

By: _Dudley R Dobie_
Name: Dudley R. Dobie, Jr.
Title: Senior Attorney
7/10/96

By: _____
Name: _____
Title: _____

**DTM CORPORATION**

By: _____
John S. Murchison, III
President & CEO

-3-

UTAUS Agreement No. 02-061

# AMENDMENT No. 2 TO LICENSE AGREEMENT

This Amendment No. 2 to License Agreement ("Amendment #2") is made and entered into as of February 28, 2003 by and between 3D Systems, Inc. ("3D Systems" or "Licensee" as the case may be) and The University of Texas at Austin ("UT-Austin"), a component of the University of Texas System ("System") which is governed by its Board of Regents ("Board").

## RECITALS

A.     3D Systems and Board on behalf of UT-Austin entered into a License Agreement dated December 3, 1987 (the "License Agreement"), between the Board and Nova Automation Corporation ("Nova"), a Texas corporation and 3D System's predecessor in interest.

B.     On February 27, 1989, the corporate name of Nova was changed to DTM Corporation ("DTM").

C.     The License Agreement was next supplemented on or about March 20, 1992 ("Supplement"), to clarify how royalty should be calculated on different laser sintering apparatus ("LAS") systems and materials sold, and or used by DTM.

D.     The License Agreement was then amended on October 27, 1994, (i) to permit DTM to defer a portion of its royalty payments under Article V of the License Agreement ("Amendment #1") and (ii) to permit DTM to reduce its royalty payments as outlined in the License Agreement in connection with its acquisition of the Householder Patent.

E.     The License Agreement, its Supplement and Amendment #1 are collectively referred to as the "License Agreement."

F.     The License Agreement was further amended and assigned to 3D Systems on August 9 – 10, 2001 when 3D Systems acquired DTM.

G.     On February 26, 2003, System obtained approval from the Texas Attorney General's office to voluntarily join 3D Systems as co-party plaintiffs in a certain patent litigation ("Litigation ") against EOS GmbH (a German corporation; "EOS") regarding certain patents licensed from System (See Joinder Letter dated February 19, 2003 from the Keith Kosco, general counsel of 3D to Mike Godfrey, general counsel of System.).  Subsequently, EOS was served with this lawsuit on February 26, 2003.



EXHIBIT

D

000033

H.   In connection with System's agreement to join 3D Systems in the above mentioned Litigation, the parties wish to further amend the License Agreement to address (a) new royalty payments for Nylon Materials (as defined below), (b) conflicts of interest, if any, resulting from the Litigation, (c) mutual release, and (d) new audit procedures for royalty reporting.

NOW, THEREFORE, it is hereby agreed as follows:

1. The following new Section 5.9 is added to the License Agreement to read in its entirety:

5.9   (a)   Beginning on February 19, 2003 and continuing thereafter, 3D Systems agrees pay to Board according to the schedule set forth in Section 5.6 of the License Agreement the following royalty on gross sales (as defined below in Section 5.10) of the Nylon Materials (as defined below in Section 5.11):

4% on Gross Sales Price up to $10,000,000
3% on Gross Sales Price up to $15,000,000
2% on Gross Sales Price up to $20,000,000
1% on all amounts over $20,000,000

2. The following new Section 5.10 is added to the License Agreement to read in its entirety:

5.10   For the purposes of this License Agreement, "Gross Sale Price" means:

(a)   where Nylon Materials are sold individually, and not as a component of a package of products, the "invoice price" for Nylon Materials Sold (as defined in the License Agreement) by Licensee:

(i)   less any tax or government charge levied on the sale, including all sales tax, goods and services tax, use and turnover taxes, import, export, and excise duties and taxes, customs duties, taxes, imposts and the like; and

(ii)   the parties agree to make allowances for Nylon Materials returned for which credit is actually given;

(b)   where Nylon Materials are sold as a component of a package of products, and not individually sold, the Gross Sales Price shall reflect any discounts allocated to the Nylon Materials by Licensee; provided, however that such discounts shall not exceed 20% of the published "list price" for Nylon Materials as sold separately by Licensee.

000034

(i)    less any tax or government charge levied on the sale, including all sales tax, goods and services tax, use and turnover taxes, import, export, and excise duties and taxes, customs duties, taxes, imposts and the like; and

(ii)    the parties agree to make allowances for Nylon Materials returned for which credit is actually given; and

For sake of clarity, here is an Example describing Section 5.10 (b) above: Licensee sells a package consisting of a machine (list price **$50,000),** 100 pounds of Nylon Materials (list price $40,000) and a two year service agreement (list price $10,000) for a total of $90,000. This represents a $10,000 discount from the aggregate list price of the components of the package. Although not reflected on the face of the invoice, Licensee allocates $5,000 of the discount to the machine and $5,000 of the discount to the materials. The Gross Sales Price of the materials for purposes of this agreement would be $35,000.

(c)    where Nylon Materials are sold to any Affiliate (as defined below) which will be using the Nylon Materials and not reselling them, the Gross Sales Price shall be the published "list price" for such materials:

(i)    less any tax or government charge levied on the sale, including all sales tax, goods and services tax, use and turnover taxes, import, export, and excise duties and taxes, customs duties, taxes, imposts and the like; and

(ii)    the parties agree to make allowances for Nylon Materials returned for which credit is actually given.

3. The following new Section 5.11 is added to the License Agreement to read in its entirety:

5.11 For the purposes of this License Agreement, Nylon Materials means powders for use in laser sintering containing a nylon polyamide or glass-filled nylon polyamide and covered by the Nylon Patents, as defined in Paragraph 6 below, which are currently marketed under the following 2 product identifications: **"DuraForm PA"** and **"DuraForm** GF".

4. The following new Section 5.12 is added to the License Agreement to read in its entirety:

5.12 For the purpose of this License Agreement, "Affiliate" means any business entity more than 50% owned by Licensee, any business entity that owns more than 50% of Licensee, or any business entity that is more

than 50% owned by a business entity that owns more than 50% of Licensee.

5. The following new Section 5.13 is added to the License Agreement to read in its entirety:

    5.13   (a)   3D Systems is responsible for payment of all reasonable and documented fees, costs and other expenses related to the Litigation; however, the first 2 million dollars 3D **Systems** spends on the **Litigation** (the "Cost Cap") will be reimbursed to it as follows:  3D Systems will offset 100% of its Section 5.9 royalty payments to Board until the earlier of (i) August 19,2004 **(e.g.,** 18 months from date of Joinder Letter referenced in Recital G above) or (ii) until it has reached the Cost Cap.

For sake of clarity, here is an Example describing Section 5.13 (a) above
For an existing lawsuit: Assume that the Legal costs for the period from **10/1/03-12/31/03** are $100,000
Assume that gross materials revenues are $8,000,000
8,000,000  x .04 = $320,000 (the royalties due UT)
$100,000 is allocated to legal expenses
$220,000 goes to UT for royalty payment

    (b)   **If** 3D Systems has not reached the Cost Cap after 18 months, 3D Systems will offset its royalty payments to Board by the schedule below until it reaches the Cost Cap.

    3% on Gross Sales Price up to $10,000,000
    2% on Gross Sales Price up to $15,000,000
    1% on Gross Sales Price up to $20,000,000

For sake of clarity, here is an Example describing Section 5.13 (b) above
For an existing lawsuit: Assume that the Legal costs for the period from **10/1/05-12/31/05** are $200.000 and that  aast **legal** costs offset under the **Cost Cap** total **$500,000** ·
Note that this is now 2005, so 18 months have passed since the agreement was signed.
Assume that gross materials revenues are $8,000,000
8,000,000  x .03 = $240,000 (the royalties allocated to pay legal expenses)
8,000,000  x .01  = $ 80,000 (the royalties paid to UT)

    (c)   After 3D Systems has reached the Cost Cap in Section 5.13 (b) above, then it will revert to paying Board the royalties as outlined in Section 5.9 above.  Board's  only responsibility with respect to costs relating to the Litigation is as set forth herein; provided, however, that the Board shall assist 3D Systems in selecting local counsel and reviewing associated legal bills.

000036

(d)    On a quarterly basis, and coincident with 3D Systems receiving bills from its attorneys, 3D Systems will deliver to Board and UT-Austin an accounting in writing itemizing the costs and expenses of the Litigation and showing the offset amounts applied to the Cost Cap.

(e)    **If,** under the terms of the Joinder Letter referenced in Recital G above, it is determined that an actual conflict of interest has arisen and System has elected to retain separate counsel, 3D System shall be responsible for the payment of all costs and expenses related to such separate counsel, but shall be entitled to offset those expenses in their entirety against Section 5.9 royalty payments at a rate of 100% after the Section 5.13 (a) or Section 5.13 (b) Cost Cap has been reached.

6. The following new Section 5.14 is added to the License Agreement to read in its entirety:

5.14   (a)    3D Systems will only pay Section 5.9 royalties to Board for the term of the following patents:  U.S. Patent Nos. 5,342,919;  5,648,450; 5,990,268;  and 6,136,948  ((the "Nylon Patents").  In exchange for these payments, Board, for itself and no other party, releases any claim it might have under the License Agreement to royalty payments with respect to the Nylon Patents **and/or** the Sale of Nylon Materials.  Neither the payment of Section 5.9 royalties nor this release represent an admission or acknowledgement on the merits of any claims that Nylon Materials are covered by the License Agreement.

(b)    Board has sole discretion to decide how to allocate or distribute the royalty payments due under this agreement; provided, however, that any allocation of such payments to Carl Deckard ("Deckard") shall not constitute an admission or acknowledgment that Deckard is an inventor on any of the Nylon Patents.

(c)    The parties hereby agree that the provisions of paragraph 2 of a certain letter agreement dated October 9, 2002 (the "Letter Agreement") between the parties regarding resolution of disputes regarding the Nylon Patents is null and void and is hereby superceded by this Amendment **#2** and that neither party shall have any obligations under that paragraph.

7. The following new Section 8.3 is added to the License Agreement to read in its entirety:

8.3   (a)    **If 3D** Systems initiates a lawsuit against an entity for any potential infringement of the Nylon Patents **("Third** Party Litigation"), it will advise Board in writing within **15** business days of initiating the Third Party Litigation.  3D Systems is responsible for payment of all reasonable and

000037

documented fees, costs and other expenses ("Fees") related to the Third Party Litigation; however, each time 3D Systems receives an invoice from its attorneys, 3D Systems is entitled to offset 50% of the invoice against its Section 5.9 royalty payments to Board up to a maximum of $1,000,000 ("Third Party Cost Cap") until the earlier of (i) August 19,2004 **(e.g.,** 18 months from date of Joinder Letter referenced in Recital G above) or (ii) until it has reached the Third Party Cost Cap.

For sake of clarity, here is an Example describing Section 8.3 (a) above for a new lawsuit: Assume that the Legal costs for the period from **10/1/04-** 12/31/04 are $200,000 and that there are no outstanding legal bills Assume that gross materials revenues are $8,000,000
8,000,000 x .04 = $320,000 (the royalties due UT)
$100,000 is allocated to legal expenses (50% of $200,000)
$220,000 is paid to UT

(b)     If 3D Systems has not reached the Third Party Cost Cap after 18 months, 3D Systems will offset Board's 50% share due to 3D Systems by the schedule below until it reaches the Third Party Cost Cap.

3% on Gross Sales Price up to $10,000,000
2% on Gross Sales Price up to $15,000,000
1% on Gross Sales Price up to $20,000,000

(c)     After 3D Systems has reached the Third Party Cost Cap in Section 8.3 (b) above, then it will revert to paying Board the royalties as outlined in Section 5.9 above. Board's only responsibility with respect to costs relating to the Third Party Litigation is as set forth herein; provided, however, that the Board shall assist 3D Systems in selecting local counsel and reviewing associated legal bills.

(d)     On a monthly basis, and coincident with 3D Systems receiving bills from its attorneys, 3D Systems will deliver to Board and **UT-** Austin an accounting in writing itemizing the costs and expenses of the Third Party Litigation and showing the offset amounts applied to the Third Party Cost Cap.

(e)     If, under the terms of the Joinder Letter referenced in Recital G above, it is determined that an actual conflict of interest has arisen and System has elected to retain separate counsel, 3D Systems shall be responsible for the payment of all costs and expenses related to such separate counsel, but shall be entitled to offset 50% of those expenses against Section 5.9 royalty payments after the Section 8.3 (a) or Section 8.3 (b) Third Party Cost Cap has been reached.

000038

8. *Section* 5.6 in the License Agreement shall be deleted in its entirety and replaced with the following:

**5.6** **In** addition to the reporting requirements and schedules outlined in the License Agreement, including but not limited to Section **5.6,** 3D Systems shall, in connection with its annual audit for the SEC, also provide to Board a royalty report (the "Annual Royalty Report"), certified by 3D Systems' independent auditors, that the royalties paid under the License Agreement for the previous fiscal year were properly calculated and accurately reflect the terms of the License Agreement. The cost of the Annual Royalty Report shall be borne equally by the Board and 3D Systems; provided, however, that Board's share of such costs does not exceed **$5,000** per report. 3D Systems will deliver this Annual Royalty Report to Board within **30** days of filing with the SEC the Form **10K** for the fiscal year to which the Annual Royalty Report relates.

9.      Except as expressly provided in this Amendment #2, all other terms, conditions and provisions of the License Agreement (as defined above) shall continue in full force and effect as provided therein.

IN WITNESS WHEREOF, Board and 3D Systems have entered into this Amendment #2 effective as of the date first set forth above.

ON BEHALF OF THE
BOARD OF REGENTS OF THE
UNIVERSITY OF TEXAS SYSTEM                    3D SYSTEMS, INC.

Juan M. Sanchez, Ph.D.                        Name _Keith Cosa_
Vice President for Research                   Title _General Counsel & Corporate_
The University of Texas at Austin             _Secretary_
Date_____                  Date _6/20/0)_

000039



KEITH A. ROBERSON
INTELLECTUAL PROPERTY AND TECHNOLOGY COUNSEL
DIRECT: 803.326.4004
FAX: 803.324.4796
E-MAIL: ROBERSONK@3DSYSTEMS.COM

**VIA FIRST CLASS MAIL**

December 23, 2008

Juan M. Sanchez, PhD
Vice President of Research
The University of Texas at Austin
Office Location:  MAI 302; ETC 9.150
P. O. Box 7996
Austin, TX 78713
jsanchez@mail.utexas.edu

VP RESEARCH OFFICE
U.T. AUSTIN

REC'D    JAN 0 5 2009

REFER TO: _____ ~~mS~~
HANDLE _____
COMMENT & RETURN _____
FILE OR DISCARD _____
                            XC: Tscoe

**Re:    3D Systems Royalty Payments for Nylon Materials Per the February 28, 2003
Amendment to the December 3, 1987 Patent License Agreement**

Dear Dr. Sanchez:

        3D Systems Corporation ("3D Systems") has recently completed a review of its patent
license agreements with the University of Texas in order to ensure that the proper royalties are
being paid.  This review included the December 3, 1987 patent license agreement (the "1987
Agreement") that is currently in effect between 3D Systems and the Board of Regents of the
University of Texas System (the "Board").  This review further included the amendments to the
Agreement, including the February 28, 2003 amendment (the "2003 Amendment") that is the
subject of this letter.

        During our review, we discovered that 3D Systems has inadvertently been paying
royalties on products that do not constitute "Nylon Materials" as defined in the 2003
Amendment.  Section 5.11, which was added to the 1987 Agreement by the 2003 Amendment,
states:

                Nylon Materials means powders for use in laser sintering containing a
                nylon polyamide or glass-filled polyamide and covered by the Nylon
                Patents, as defined in Paragraph 6 ….

Paragraph 6 of the 2003 Amendment, which added Section 5.14 to the 1987 Agreement, states:

                3D Systems will only pay … royalties to Board for the term of the
                following patents:  U.S. Patent Nos. 5,342,919; 5,648,450; 5,990,268; and
                6,136,948 ((the "Nylon Patents").

        Therefore, 3D Systems is required to pay royalties for only Nylon Materials that are
"covered by the Nylon Patents," and those patents consist only of U.S. patents.  This means that



EXHIBIT

**E**

000040



KEITH A. ROBERSON
INTELLECTUAL PROPERTY AND TECHNOLOGY COUNSEL
DIRECT: 803.326.4004
FAX: 803.324.4796
E-MAIL: ROBERSONK@3DSYSTEMS.COM

only nylon powder materials that 3D Systems makes, uses, offers to sell or sells within the U.S. or imports into the U.S. are covered by the Nylon Patents and qualify as Nylon Materials. Therefore, 3D Systems has never been under any duty to pay the Board royalties on nylon powder materials that have no connection to the U.S., and 3D Systems has been overpaying royalties for several years.

Currently, and during the entire effective period of the 2003 Amendment, 3D Systems has purchased all of its nylon powder materials from outside suppliers, and those suppliers manufacture the nylon powder materials in Europe. For nylon powder materials sold by 3D Systems in the U.S., 3D Systems imports the nylon powder material into the U.S. prior to selling the material within the U.S. For nylon powder materials sold by 3D Systems outside the U.S., our suppliers each ship the nylon powder materials directly from Europe into the country into in which the nylon powder material is sold. Therefore, all nylon powder materials sold by 3D Systems outside the U.S. never enter the U.S., have no connection with the U.S., are not "covered by the Nylon Patents" and are not Nylon Materials for which royalty payments are required.

Going forward, in accordance with the 2003 Amendment, 3D Systems will pay royalties for only nylon powder materials that are sold or imported into the U.S. Conversely, 3D Systems will not be paying royalties on nylon powder materials that are not sold or imported into the U.S. The attached report for the second and third quarters of 2008 has been prepared in a manner consistent with this approach.

Looking back to the previous payments made pursuant to the 2003 Amendment, 3D Systems has been overpaying royalties since February 2003, which is reflected in the attached documentation previously provided to the Board with the corresponding royalty payments. This documentation includes royalty reports for the entire effective period of the 2003 Amendment. These royalty reports separate out on their face the geographic areas into which the nylon powder materials were sold, so it is easy to confirm which amounts were correctly paid for Nylon Materials and which amounts were unintentionally incorrectly paid for nylon powder materials that are not subject to royalty payments. As reflected in the attached summary sheet, the amount of overpayment to date (the "Overpayment") is a total of $765,815.70.

The Board is not entitled to keep the Overpayment under the terms of the 1987 Agreement or any of the amendments, including the 2003 Amendment, thereto. Accordingly, 3D Systems requests that the Board refund the Overpayment to 3D Systems at the Board's earliest convenience. 3D Systems expects to be paid back in full.

Nevertheless, until 3D Systems has received payment of such refund in full, it will withhold future payments under the 1987 Agreement, which include payments for both Nylon Materials and systems, to offset the full amount of the Overpayment. Under the 1987 Agreement and as indicated in the attached royalty report for the second and third quarters of 2008, 3D Systems was scheduled to pay the Board $228,919.75 for the second and third quarters of 2008. However, 3D Systems has allocated these amounts against the Overpayment, thereby reducing



Keith A. Roberson
Intellectual Property and Technology Counsel
Direct: 803.326.4004
Fax: 803.324.4796
E-mail: RobersonK@3DSystems.com

the amount of the Overpayment due and owing to 3D Systems to $536,895.95 as of September 30, 2008.  3D Systems will continue to send royalty reports in accordance with our standard procedure but will continue to allocate future amounts due to the Board against the Overpayment until the outstanding Overpayment has been paid in full to 3D Systems, at which time 3D Systems will resume sending payments to the Board in due course.

If you or any members of your team have any questions or concerns regarding the subject matter of this letter, please feel free to contact me at your convenience.

Sincerely,

Keith A. Roberson
Intellectual Property and Technology Counsel
3D Systems Corporation


Enclosures:     Summary of Royalties for Nylon Materials to University of Texas
                Copies of Royalty Reports from February 2003 through March 2008
                Royalty Report for the Second and Third Quarters of 2008

3D Systems Corp.
Royalties for Nylon to Univ of Texas History
CY 2003 - Oct 2008

| Month | Year | Total | Royalty Base NON-US | Royalty Base US | Rate | Royalty Due | Paid | Over Payment | Comments |
|---|---|---|---|---|---|---|---|---|---|
| January | 2008 | $ 2,164,740.66 | $ 1,620,731.69 | $ 544,008.97 | 1% | $ 5,440.09 | $ 21,647.41 | $ (16,207.32) | |
| February | 2008 | 2,108,965.25 | 1,702,382.27 | 406,582.98 | 1% | 4,065.83 | 21,089.65 | (17,023.82) | |
| March | 2008 | 2,786,645.15 | 2,101,023.27 | 685,621.88 | 1% | 6,856.22 | 27,866.45 | (21,010.23) | |
| April | 2008 | | | | 1% | - | - | - | |
| May | 2008 | | | | 1% | - | - | - | |
| June | 2008 | | | | 1% | - | - | - | |
| July | 2008 | | | | 1% | - | - | - | |
| August | 2008 | | | | 1% | - | - | - | |
| September | 2008 | | | | 1% | - | - | - | |
| October | 2008 | | | | 1% | - | - | - | |
| November | 2008 | | | | 1% | - | - | - | |
| | | | | | | | | | |
| January | 2007 | 1,910,795.44 | 1,408,716.41 | 502,079.03 | 1% | 5,020.80 | - | 5,020.80 | |
| February | 2007 | 1,957,810.25 | 1,417,946.88 | 539,863.37 | 1% | 5,398.64 | - | 5,398.64 | |
| March | 2007 | 2,724,542.07 | 2,067,496.55 | 657,045.52 | 1% | 6,570.46 | - | 6,570.46 | |
| April | 2007 | 2,220,878.72 | 1,666,325.26 | 554,553.46 | 1% | 5,545.54 | 22,208.79 | (16,663.25) | |
| May | 2007 | 2,012,595.29 | 1,432,811.73 | 579,783.56 | 1% | 5,797.84 | 20,125.95 | (14,328.11) | |
| June | 2007 | 2,338,188.54 | 1,628,563.93 | 709,624.61 | 1% | 7,096.25 | 19,562.20 | (12,465.95) | |
| July | 2007 | 2,882,663.69 | 2,195,970.56 | 686,693.13 | 1% | 6,866.94 | 28,826.64 | (21,959.70) | |
| August | 2007 | 2,178,684.25 | 1,439,254.53 | 739,429.72 | 1% | 7,394.30 | 21,786.84 | (14,392.54) | |
| September | 2007 | 2,283,139.47 | 1,605,289.31 | 677,850.16 | 1% | 6,778.51 | 22,831.39 | (16,052.88) | |
| October | 2007 | 2,546,386.22 | 1,966,792.94 | 579,593.28 | 1% | 5,795.94 | 25,463.86 | (19,667.92) | |
| November | 2007 | 2,994,626.27 | 2,222,697.57 | 771,928.70 | 1% | 7,719.29 | 29,946.26 | (22,226.97) | |
| December | 2007 | 2,849,484.57 | 2,117,100.98 | 732,383.59 | 1% | 7,323.84 | 28,494.85 | (21,171.01) | |
| | | | | | | | | | |
| January | 2006 | 1,530,280.95 | 947,426.33 | 582,854.62 | 1% | 5,828.55 | 15,256.65 | (9,428.10) | |
| February | 2006 | 1,768,571.96 | 1,081,845.40 | 686,726.56 | 1% | 6,867.27 | 17,723.15 | (10,855.88) | |
| March | 2006 | 2,026,033.09 | 1,265,838.00 | 760,195.09 | 1% | 7,601.96 | 20,275.38 | (12,673.42) | |
| April | 2006 | 1,302,304.66 | 920,410.16 | 381,894.50 | 1% | 3,818.95 | 13,023.05 | (9,204.10) | |
| May | 2006 | 2,422,859.46 | 1,609,559.04 | 813,300.42 | 1% | 8,133.01 | 24,242.85 | (16,109.84) | |
| June | 2006 | 2,097,790.44 | 1,348,352.18 | 749,438.26 | 1% | 7,494.39 | 22,235.57 | (14,741.18) | |
| July | 2006 | 1,307,771.47 | 835,796.85 | 471,974.62 | 1% | 4,719.75 | 13,077.71 | (8,357.96) | |
| August | 2006 | 1,805,863.49 | 1,192,386.35 | 613,477.14 | 1% | 6,134.78 | 18,058.63 | (11,923.85) | |
| September | 2006 | 2,008,902.99 | 1,316,954.65 | 691,948.34 | 1% | 6,919.49 | 20,089.03 | (13,169.54) | |
| October | 2006 | 1,745,343.06 | 1,247,987.10 | 497,355.96 | 1% | 4,973.56 | 17,453.43 | (12,479.87) | |
| November | 2006 | 2,401,656.33 | 1,890,361.22 | 511,295.11 | 1% | 5,112.96 | 24,016.56 | (18,903.60) | |
| December | 2006 | 2,472,618.31 | 1,777,173.69 | 695,444.62 | 1% | 6,954.45 | 23,447.96 | (16,493.51) | |

3D Systems Corp.
Royalties for Nylon to Univ of Texas History
CY 2003 - Oct 2008

| Month | Year | Total | Royalty Base NON-US | Royalty Base US | Rate | Royalty Due | Paid | Over Payment | Comments |
|---|---|---|---|---|---|---|---|---|---|
| July | 2006 | | | | | | 15,615.22 | (15,615.22) | Additional check remitted in error |
| August | 2006 | | | | | | 25,462.42 | (25,462.42) | Additional check remitted in error |
| September | 2006 | | | | | | 28,673.52 | (28,673.52) | Additional check remitted in error |
| | | | | | | | | | |
| January | 2005 | 1,188,024.24 | 1,133,861.06 | 54,163.18 | 1% | 541.64 | 12,035.98 | (11,494.34) | |
| January | 2005 | | | 543,938.82 | 2% | 10,878.78 | | 10,878.78 | |
| February | 2005 | 1,408,689.34 | 710,333.34 | 698,356.00 | 2% | 13,967.12 | 14,306.89 | (339.77) | |
| March | 2005 | 1,577,970.76 | 918,766.16 | 659,204.60 | 2% | 13,184.10 | 16,142.71 | (2,958.61) | |
| April | 2005 | 1,648,905.74 | 784,722.14 | 864,183.60 | 2% | 17,283.68 | 16,489.06 | 794.62 | |
| May | 2005 | 1,558,947.10 | 796,083.70 | 762,863.40 | 2% | 15,257.27 | 15,589.47 | (332.20) | |
| June | 2005 | 1,512,206.76 | 813,430.26 | 698,776.50 | 2% | 13,975.53 | 14,989.04 | (1,013.51) | |
| July | 2005 | 1,495,980.13 | 1,034,266.19 | 461,713.94 | 2% | 9,234.28 | 14,959.80 | (5,725.52) | |
| August | 2005 | 1,338,745.70 | 1,027,782.56 | 310,963.14 | 2% | 6,219.27 | 13,387.46 | (7,168.19) | |
| August | 2005 | | | | 3% | 9,239.80 | | 9,239.80 | |
| September | 2005 | 1,784,655.45 | 1,105,283.31 | | 3% | 20,381.17 | 17,846.55 | 2,534.62 | |
| October | 2005 | 1,617,610.41 | 988,543.76 | | 3% | 18,872.00 | 16,176.10 | 2,695.90 | |
| November | 2005 | 2,168,482.18 | 1,384,050.09 | | 3% | 23,532.97 | 21,684.82 | 1,848.15 | |
| December | 2005 | 1,926,452.50 | 1,278,086.56 | | 3% | 19,450.98 | 19,264.53 | 186.45 | |
| | | | | | | | | | |
| January | 2004 | 1,163,812.00 | 553,025.60 | | 3% | 18,323.60 | 33,509.30 | (15,185.70) | |
| February | 2004 | 1,156,185.50 | 759,008.90 | | 3% | 11,915.30 | 23,123.71 | (11,208.41) | |
| March | 2004 | 1,478,890.86 | 1,017,975.26 | | 3% | 13,827.47 | 29,577.82 | (15,750.35) | |
| April | 2004 | 1,354,724.94 | 872,833.54 | | 3% | 14,456.75 | 27,094.50 | (12,637.75) | |
| April | 2004 | | | 37,595.00 | 4% | 1,503.81 | | 1,503.81 | |
| May | 2004 | 1,512,813.63 | 993,758.23 | 519,055.40 | 4% | 20,762.22 | 23,825.06 | (3,062.84) | |
| June | 2004 | 1,500,746.65 | 1,028,884.65 | 471,862.00 | 4% | 18,874.48 | 15,007.47 | 3,867.01 | |
| July | 2004 | 1,142,178.52 | 747,836.52 | 394,342.00 | 4% | 15,773.68 | 11,421.79 | 4,351.89 | |
| August | 2004 | 1,271,357.99 | 870,852.59 | 400,505.40 | 4% | 16,020.22 | 12,713.58 | 3,306.64 | |
| September | 2004 | 1,591,478.77 | 1,013,306.77 | 578,172.00 | 4% | 23,126.88 | 15,914.79 | 7,212.09 | |
| October | 2004 | 1,517,365.81 | 899,074.81 | 618,291.00 | 4% | 24,731.64 | 15,173.66 | 9,557.98 | |
| November | 2004 | 1,544,039.72 | 1,032,193.32 | 511,846.40 | 4% | 20,473.86 | 15,440.40 | 5,033.46 | |
| December | 2004 | 2,134,343.47 | 1,504,065.47 | 630,278.00 | 4% | 25,211.12 | 21,343.43 | 3,867.69 | |
| | | | | | | | | | |
| January | 2003 | 136,635.85 | 95,695.85 | 40,940.00 | 4% | 1,637.60 | 5,465.43 | (3,827.83) | |
| February | 2003 | | | | 4% | | | | |
| March | 2003 | 1,637,166.57 | 1,001,900.57 | 635,266.00 | 4% | 25,410.64 | 65,486.66 | (40,076.02) | |
| April | 2003 | 1,132,609.40 | 580,046.60 | 552,562.80 | 4% | 22,102.52 | 45,304.38 | (23,201.86) | |
| May | 2003 | 1,109,323.79 | 722,699.79 | 386,624.00 | 4% | 15,464.96 | 44,372.95 | (28,907.99) | |
| June | 2003 | 1,510,018.46 | 828,491.06 | 681,527.40 | 4% | 27,261.10 | 60,400.74 | (33,139.64) | |
| July | 2003 | 1,333,010.32 | 851,919.12 | 481,091.20 | 4% | 19,243.65 | 53,320.41 | (34,076.76) | |

3D Systems Corp.
Royalties for Nylon to Univ of Texas History
CY 2003 - Oct 2008

| Month | Year | Total | Royalty Base NON-US | Royalty Base US | Rate | Royalty Due | Paid | Over Payment | Comments |
|---|---|---|---|---|---|---|---|---|---|
| August | 2003 | 890,802.15 | 466,841.35 | 423,960.80 | 4% | 16,958.44 | 35,632.09 | (18,673.65) | |
| September | 2003 | 1,696,440.36 | 858,339.16 | 838,101.20 | 4% | 33,524.05 | 67,857.61 | (34,333.56) | |
| October | 2003 | 1,180,028.35 | 664,791.15 | 515,237.20 | 4% | 20,609.49 | 47,201.13 | (26,591.64) | |
| November | 2003 | 1,167,969.68 | 731,826.08 | 436,143.60 | 4% | 17,445.75 | 46,718.79 | (29,273.04) | |
| December | 2003 | 2,182,688.71 | 1,336,090.11 | 846,598.60 | 4% | 33,863.95 | 87,307.55 | (53,443.60) | |
| | | | | | | $ 818,771.38 | $ 1,584,587.08 | $ (765,815.70) | |

1st $10M @ 4%
        3%
Next $5M @ 2%
> $20M   @ 1%

3D Systems, Inc
UT Nylon Materials Royalty Accrual
12/31/2003
02/19/03 - 12/31/03

| Period / Sales Desc | MTD | QTD | YTD | 1 01/24/03 | 2 02/21/03 | 3 03/28/03 | 4 04/25/03 | 5 05/23/03 | 6 06/27/03 | 7 07/25/03 | 8 08/22/03 | 9 09/26/03 | 10 10/24/03 | 11 11/21/03 | 12 12/31/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US | 846,598.60 | 1,797,979.40 | 5,838,052.80 | - | 40,940.00 | 635,266.00 | 552,562.80 | 386,624.00 | 681,527.40 | 481,091.20 | 423,950.80 | 838,101.20 | 515,237.20 | 436,143.60 | 846,598.60 |
| UK | 120,044.30 | 262,713.45 | 1,105,016.92 | - | 11,435.57 | 154,970.09 | 123,223.91 | 162,690.46 | 135,403.83 | 93,823.25 | 56,556.79 | 104,199.57 | 91,609.13 | 51,060.02 | 120,044.30 |
| France | 27,293.14 | 214,705.37 | 664,584.20 | - | 7,711.15 | 99,366.15 | 23,486.55 | 78,879.68 | 55,687.41 | 146,546.86 | 2,486.82 | 35,714.21 | 44,752.35 | 142,659.88 | 27,293.14 |
| Germany | 467,010.50 | 976,288.30 | 3,217,750.69 | - | 72,515.36 | 415,646.66 | 200,764.22 | 218,003.46 | 324,350.09 | 365,047.98 | 250,042.47 | 395,092.15 | 222,939.63 | 286,338.17 | 467,010.50 |
| Italy | 176,071.07 | 413,628.40 | 1,101,798.93 | - | - | 139,305.24 | 72,703.44 | 101,234.03 | 128,897.40 | 109,058.14 | 50,855.26 | 86,117.02 | 133,148.59 | 104,408.74 | 176,071.07 |
| Spain | 13,912.50 | 45,144.30 | 45,144.30 | - | - | - | - | - | - | - | - | - | 11,573.70 | 19,658.10 | 13,912.50 |
| Japan | 531,758.60 | 820,227.52 | 2,004,345.80 | - | 4,033.77 | 192,612.43 | 159,868.48 | 161,892.16 | 184,152.33 | 137,442.89 | 106,900.01 | 237,216.21 | 160,767.75 | 127,701.17 | 531,758.60 |
| Total Sales | 2,182,689 | 4,530,687 | 13,976,693.64 | | 136,635.85 | 1,637,166.57 | 1,132,609.40 | 1,109,323.79 | 1,510,018.46 | 1,333,010.32 | 890,802.15 | 1,696,440.36 | 1,180,028.35 | 1,167,969.68 | 2,182,688.71 |
| **Royalty Rate:** | | | | | | | | | | | | | | | |
| First 10 Million in Sales | | | 4.00% | | | | | | | | | | | | |
| Next 10 Million in Sales | | | 3.00% | | | | | | | | | | | | |
| Over 20 Million in Sales | | | 1.00% | | | | | | | | | | | | |
| (rate) | | | | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| Total Royalty Due: | - | - | - | - | 5,465.43 | 65,486.66 | 45,304.38 | 44,372.95 | 60,400.74 | 53,320.41 | 35,632.09 | 67,857.61 | 47,201.13 | 46,718.79 | 87,307.55 |

Amount Due as of 12/31/03:

| | |
|---|---|
| First 10 Million in Sales | 400,000.00 |
| Next 5 Million in Sales | 119,300.81 |
| Over 20 Million in Sales | |
| Total Royalty due as of 12/31/03 | 519,300.81 |

Schedules:

| | |
|---|---|
| US Detail | 5,838,052.80 |
| UK & Japan | 8,138,640.84 |
| Total Sales | 13,976,693.64 |
| Check figure | 13,976,693.64 |
| Delta | |

Revised UT Materials Royalty Schedule.Calculation

**3D Systems, Inc**
**UT Nylon Materials Royalty Accrual**
**12/31/2004**

| Period / Sales Desc | MTD | QTD | YTD | 1 01/31/04 | 2 02/29/04 | 3 03/31/04 | 4 04/30/04 | 5 05/31/04 | 6 06/30/04 | 7 07/31/04 | 8 08/31/04 | 9 09/30/04 | 10 10/31/04 | 11 11/30/04 | 12 12/31/04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US | 630,278.00 | 1,760,415.40 | 6,112,717.20 | 610,786.40 | 397,176.60 | 460,915.60 | 519,486.40 | 519,055.40 | 471,862.00 | 394,342.00 | 400,505.40 | 578,172.00 | 618,291.00 | 511,846.40 | 630,278.00 |
| UK | 140,314.30 | 372,991.85 | 1,308,763.41 | 73,021.54 | 87,661.43 | 111,771.63 | 102,102.15 | 134,596.72 | 89,114.81 | 127,519.81 | 111,880.18 | 96,103.29 | 127,634.05 | 105,043.50 | 140,314.30 |
| France | 105,647.28 | 337,326.46 | 1,005,111.21 | 3,589.86 | 64,986.99 | 85,319.41 | 157,896.98 | 35,037.01 | 91,266.28 | 74,371.73 | 64,500.72 | 91,815.77 | 174,077.98 | 57,601.20 | 105,647.28 |
| Germany | 727,377.47 | 1,221,551.00 | 3,818,198.14 | 230,208.08 | 315,910.43 | 430,017.79 | 237,548.97 | 312,461.32 | 301,546.31 | 244,130.26 | 268,461.84 | 256,362.14 | 259,873.92 | 234,299.61 | 727,377.47 |
| Italy | 138,724.93 | 356,410.22 | 1,484,992.63 | 108,327.19 | 134,173.60 | 173,627.56 | 162,152.52 | 176,530.50 | 94,257.07 | 78,205.43 | 92,831.76 | 259,873.92 | 86,633.14 | 131,052.15 | 138,724.93 |
| Spain | 10,306.24 | 51,547.05 | 112,715.29 | - | - | 15,620.41 | - | 12,274.65 | 10,233.53 | 4,696.78 | - | 18,342.87 | 26,489.22 | 14,751.59 | 10,306.24 |
| Japan | 381,695.25 | 1,095,507.02 | 3,546,439.98 | 137,878.93 | 156,276.45 | 201,618.46 | 175,537.92 | 322,858.03 | 442,466.65 | 218,912.51 | 348,954.98 | 446,429.03 | 224,366.50 | 489,445.27 | 381,695.25 |
| Total Sales | 2,134,343 | 5,195,749 | 17,367,937.86 | 1,163,812.00 | 1,156,185.50 | 1,478,890.86 | 1,354,724.94 | 1,512,813.63 | 1,500,746.65 | 1,142,178.52 | 1,271,357.99 | 1,591,478.77 | 1,517,365.81 | 1,544,039.72 | 2,134,343.47 |
| | | | | | | | | | | | | | | | |
| Royalty on First 10M | 4% | | | | | | | | | | | | | | |
| Royalty up to 15M | 3% | | | | | | | | | | | | | | |
| Royalty up to 20M | 2% | | | | | | | | | | | | | | |
| Royalty over 20M | 1% | | | | | | | | | | | | | | |
| ACCUM SALES | | | | | | | | | | | | | | | |
| Total Royalty Due: | | | - | 33,509.30 | 23,123.71 | 29,577.82 | 27,094.50 | 23,825.06 | 15,007.47 | 11,421.79 | 12,713.58 | 15,914.79 | 15,173.66 | 15,440.40 | 21,343.43 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMOUNT UP TO 15M AND/OR 20M | 1,023,306.00 | | | | 869,692.70 | | | | | | | | |
| EXCESS ABOVE 15M AND/OR 20M | 140,506.00 | 1,156,185.50 | 1,478,890.86 | 1,354,724.94 | 643,120.93 | 1,500,746.65 | 1,142,178.52 | 1,271,357.99 | 1,591,478.77 | 1,517,365.81 | 1,544,039.72 | 2,134,343.47 | |
| ACCUM SALES | 13,976,694.00 | 15,140,506.00 | 16,296,691.50 | 17,775,582.36 | 19,130,307.30 | 20,643,120.93 | 22,143,867.58 | 23,286,046.10 | 24,557,404.09 | 26,148,882.86 | 27,666,248.67 | 29,210,288.39 | 31,344,631.86 |

*Handwritten notes:*

GJ shld have been for 21,343.43 and NOT 16,198.38

But + corrected worksheet

Bal. is writton off as of end of Dec 04 -

| Prepared by: | _____ | Date: | _____ |
|---|---|---|---|
| Approved by: | _____ | Date: | _____ |

000047

3D Systems, Inc
UT Nylon Materials Royalty Accrual
12/31/2005

| Period / Sales Desc | MTD | QTD | YTD | 1 01/31/05 | 2 02/28/05 | 3 03/31/05 | 4 04/30/05 | 5 05/31/05 | 6 06/30/05 | 7 07/31/05 | 8 08/31/05 | 9 09/30/05 | 10 10/31/05 | 11 11/30/05 | 12 12/31/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US | 648,365.94 | 2,061,864.68 | 8,103,393.18 | 598,102.00 | 698,356.00 | 659,204.60 | 864,183.60 | 762,883.40 | 698,776.50 | 461,713.94 | 618,956.32 | 679,372.14 | 629,066.65 | 784,432.09 | 648,365.94 |
| UK | 147,724.83 | 414,472.57 | 1,537,210.17 | 134,084.52 | 85,629.65 | 150,869.46 | 132,836.59 | 131,314.69 | 135,764.92 | 104,963.28 | 87,206.14 | 160,068.35 | 137,086.77 | 129,680.97 | 147,724.83 |
| France | 102,361.21 | 268,382.88 | 1,170,128.14 | 66,564.13 | 79,650.19 | 102,397.48 | 104,955.60 | 82,838.74 | 123,080.98 | 118,670.84 | 107,600.97 | 115,986.33 | 79,570.90 | 86,450.77 | 102,361.21 |
| Germany | 427,988.58 | 1,371,291.88 | 3,747,752.20 | 182,826.98 | 216,635.28 | 319,684.74 | 257,532.83 | 200,423.30 | 235,409.63 | 320,464.99 | 294,346.07 | 349,136.50 | 281,378.05 | 661,925.25 | 427,988.58 |
| Italy | 128,493.26 | 296,939.62 | 1,035,750.72 | 65,414.92 | 99,317.05 | 129,302.86 | 71,884.94 | 154,512.64 | 99,127.27 | 47,169.34 | 12,615.83 | 59,466.25 | 86,219.73 | 82,226.63 | 128,493.26 |
| Spain | 21,440.00 | 51,089.33 | 121,722.13 | 20,306.01 | - | - | 15,883.43 | 19,086.46 | - | 15,356.90 | - | - | 29,649.33 | - | 21,440.00 |
| Japan | 581,874.68 | 1,380,300.13 | 3,642,509.77 | 120,725.68 | 229,101.17 | 216,511.62 | 201,628.75 | 207,907.87 | 220,047.46 | 427,640.84 | 218,020.37 | 420,625.88 | 374,658.98 | 423,766.47 | 581,874.68 |
| Adjust US Sales | (131,796.00) | (131,796.00) | (131,796.00) | | | | | | | | | | | | (131,796.00) |
| **Total Sales** | 1,926,452.50 | 5,712,545.09 | 19,226,670.31 | 1,188,024.24 | 1,408,689.34 | 1,577,970.76 | 1,648,905.74 | 1,558,947.10 | 1,512,206.76 | 1,495,980.13 | 1,338,745.70 | 1,784,655.45 | 1,617,610.41 | 2,168,482.18 | 1,926,452.50 |
| | | | | | | | | | | | | | | | |
| Royalty on First 10M | 4% | | - | | | | | | | | | | | | |
| Royalty up to 15M | 3% | | - | | | | | | | | | | | | |
| Royalty up to 20M | 2% | | - | | | | | | | | | | | | |
| Royalty over 20M | 1% | | - | | | | | | | | | | | | |
| ACCUM SALES | | 192,266.70 | - | 11,880.24 | 14,086.89 | 15,779.71 | 16,489.06 | 15,589.47 | 15,122.07 | 14,959.80 | 13,387.46 | 17,846.55 | 16,176.10 | 21,684.82 | 19,264.53 |
| **Total Royalty Due:** | | | 192,266.70 | 11,880.24 | 14,086.89 | 15,779.71 | 16,489.06 | 15,589.47 | 15,122.07 | 14,959.80 | 13,387.46 | 17,846.55 | 16,176.10 | 21,684.82 | 19,264.53 |

TOTALS PER QUARTER:   41,748.84 (col 3)   47,200.60 (col 6)   46,193.81 (col 9)   57,125.45 (col 12, circled)

AMOUNT UP TO 15M AND/OR 20M
EXCESS ABOVE 15M AND/OR 20M:

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXCESS ABOVE 15M AND/OR 20M | 1,188,024.24 | 1,408,689.34 | 1,577,970.76 | 1,648,905.74 | 1,558,947.10 | 1,512,206.76 | 1,495,980.13 | 1,338,745.70 | 1,784,655.45 | 1,617,610.41 | 2,168,482.18 | 1,926,452.50 |

ACCUM SALES:   31,344,631.86 (YTD)   32,532,656.10   33,941,345.44   35,519,316.20   37,168,221.94   38,727,169.04   40,239,375.80   41,735,355.93   43,074,101.63   44,858,757.08   46,476,367.49   48,644,849.67   50,571,302.17

Prepared by:   Ardith Mahoney                     Date: 01/09/06
Approved by:   [signature]                         Date: 3-20-06

**3D Systems, Inc**
**UT Nylon Materials Royalty Accrual**
12/31/2006

| Period / Sales Desc | MTD | QTD | YTD | 1 (01/31/06) | 2 (02/28/06) | 3 (03/31/06) | 4 (04/30/06) | 5 (05/31/06) | 6 (06/30/06) | 7 (07/31/06) | 8 (08/31/06) | 9 (09/30/06) | 10 (10/31/06) | 11 (11/30/06) | 12 (12/31/06) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US | 695,444.62 | 1,704,095.69 | 7,455,905.24 | 582,854.62 | 686,726.56 | 760,165.09 | 381,894.50 | 813,300.42 | 749,438.26 | 471,974.62 | 613,477.14 | 691,948.34 | 497,355.96 | 511,295.11 | 695,444.62 |
| UK | 165,144.12 | 489,145.17 | 1,504,034.90 | 148,390.28 | 134,938.92 | 37,623.02 | 47,888.99 | 138,396.75 | 127,523.32 | 63,939.32 | 146,411.47 | 169,777.66 | 141,243.83 | 182,757.22 | 165,144.12 |
| France | 92,180.02 | 370,293.29 | 1,250,030.87 | 82,668.77 | 110,214.25 | 172,524.57 | 53,976.77 | 84,886.37 | 119,962.19 | 43,970.88 | 147,289.88 | 64,043.90 | 147,581.56 | 130,531.71 | 92,180.02 |
| Germany | 532,700.11 | 1,860,116.32 | 5,355,889.19 | 256,687.74 | 320,760.80 | 443,950.11 | 236,633.40 | 727,060.09 | 239,603.79 | 227,349.93 | 472,084.48 | 571,642.53 | 474,768.19 | 852,648.02 | 532,700.11 |
| Italy | 144,276.09 | 281,868.58 | 1,257,261.52 | 49,462.72 | 75,649.06 | 181,911.50 | 43,004.77 | 86,987.53 | 147,843.54 | 163,629.45 | 46,056.31 | 180,868.06 | 63,341.75 | 74,250.74 | 144,276.09 |
| Spain | 21,736.83 | 21,736.83 | 100,766.00 | 9,932.52 | 19,579.33 |  |  | 9,427.81 | 40,089.51 |  |  |  |  |  | 21,736.83 |
| Japan | 821,136.52 | 1,892,361.82 | 5,966,088.49 | 400,084.30 | 420,703.04 | 429,828.80 | 538,906.23 | 562,800.49 | 673,329.83 | 336,907.27 | 380,544.21 | 330,622.50 | 421,051.77 | 650,173.53 | 821,136.52 |
| Adjust US Sales |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| **Total Sales** | 2,472,618.31 | 6,819,617.70 | 22,889,998.21 | 1,530,280.95 | 1,768,571.96 | 2,026,033.09 | 1,302,304.66 | 2,422,859.46 | 2,097,790.44 | 1,307,771.47 | 1,805,863.49 | 2,008,902.99 | 1,745,343.06 | 2,401,656.33 | 2,472,618.31 |

| | % | YTD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Royalty on First 10M | 4% | | | | | | | | | | | | | |
| Royalty up to 15M | 3% | | | | | | | | | | | | | |
| Royalty up to 20M | 2% | | | | | | | | | | | | | |
| Royalty over 20M | 1% | (228,899.96) | (15,302.81) | (17,685.72) | (20,260.33) | (13,023.05) | (24,228.59) | (20,977.90) | (13,077.71) | (18,058.63) | (20,089.03) | (17,453.43) | (24,016.56) | (24,726.18) |
| ACCUM SALES | | | | | | | | | | | | | | |
| **Total Royalty Due:** | | (228,899.96) | (15,302.81) | (17,685.72) | (20,260.33) | (13,023.05) | (24,228.59) | (20,977.90) | (13,077.71) | (18,058.63) | (20,089.03) | (17,453.43) | (24,016.56) | (24,726.18) |

Quarterly totals: (53,248.86)   (58,229.55)   (51,225.38)   (66,196.18)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance: Royalty Liability | (57,125.45) | (72,428.26) | (90,113.98) | (53,248.86) | (66,271.91) | (90,500.50) | (58,223.23) | (71,300.94) | (29,858.12) | (49,947.15) | (67,400.58) | (91,417.14) |
| Royalty Payments | | | 57,125.45 | | | 53,255.18 | | 59,501.46 | | | | |
| Adjustments | (15,302.81) | (17,685.72) | (20,260.33) | (13,023.05) | (24,228.59) | (20,977.90) | (13,077.71) | (18,058.63) | (20,089.03) | (17,453.43) | (24,016.56) | (24,726.18) |
| **Total Royalty Due** | (72,428.26) | (90,113.98) | (53,248.86) | (66,271.91) | (90,500.50) | (58,223.23) | (71,300.94) | (29,858.12) | (49,947.15) | (67,400.58) | (91,417.14) | (116,143.32) |

**AMOUNT UP TO 15M AND/OR 20M**
**EXCESS ABOVE 15M AND/OR 20M**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXCESS ABOVE 15M AND/OR 20M | 1,530,280.95 | 1,768,571.96 | 2,026,033.09 | 1,302,304.66 | 2,422,859.46 | 2,097,790.44 | 1,307,771.47 | 1,805,863.49 | 2,008,902.99 | 1,745,343.06 | 2,401,656.33 | 2,472,618.31 |

| ACCUM SALES | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50,571,302.17 | 52,101,583.12 | 53,870,155.08 | 55,896,188.17 | 57,198,492.83 | 59,621,352.29 | 61,719,142.73 | 63,026,914.20 | 64,832,777.69 | 66,841,680.68 | 68,587,023.74 | 70,988,680.07 | 73,461,298.38 |

| Prepared by: | Fran Bailey | Date: | 02/03/06 |
|---|---|---|---|
| Approved by: | _____ | Date: | _____ |

3D Systems, Inc.
UT Nylon Materials Royalty Accrual (All nylon product)
December 31, 2007

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Description | 01/31/07 | 02/28/07 | 03/31/07 | 04/30/07 | 05/31/07 | 06/30/07 | 07/31/07 | 08/31/07 | 09/30/07 | 10/31/07 | 11/30/07 | 12/31/07 |
| US | 502,079.03 | 539,863.37 | 657,045.52 | 554,553.46 | 579,783.56 | 709,624.61 | 686,693.13 | 739,429.72 | 677,850.16 | 579,593.28 | 771,928.70 | 732,383.59 |
| UK | 60,067.09 | 164,802.70 | 262,517.53 | 90,343.97 | 136,557.12 | 178,940.42 | 163,577.20 | 140,210.14 | 176,821.58 | 197,804.43 | 163,682.80 | 129,975.80 |
| France | 156,966.63 | 176,234.69 | 162,972.72 | 187,663.42 | 115,773.65 | 150,380.99 | 234,763.20 | 127,014.17 | 120,759.59 | 231,963.08 | 161,785.94 | 127,663.13 |
| Germany | 577,263.00 | 454,242.37 | 738,456.26 | 613,321.65 | 401,999.78 | 646,786.78 | 886,652.94 | 494,111.71 | 603,088.73 | 676,384.42 | 992,311.28 | 986,439.35 |
| Italy | 253,943.64 | 35,740.97 | 177,924.53 | 94,593.30 | 271,666.22 | 107,049.27 | 122,555.88 | 22,894.52 | 120,639.24 | 275,360.27 | 121,764.96 | 69,574.51 |
| Spain | - | - | - | - | - | - | - | - | - | - | - | - |
| Hong Kong | 35,544.00 | 28,109.00 | 6,579.00 | 76,239.00 | 9,868.50 | 28,240.00 | 6,579.00 | - | - | - | - | - |
| Japan | 324,932.04 | 558,817.13 | 719,046.53 | 604,163.92 | 496,946.46 | 517,166.48 | 781,842.36 | 655,023.98 | 531,201.16 | 583,410.74 | 721,451.08 | 664,008.19 |
| Adjust US Sales | | | | | | | | | | | | |
| Total Sales | 1,910,795.43 | 1,957,810.23 | 2,724,542.09 | 2,220,878.72 | 2,012,595.29 | 2,338,188.55 | 2,882,663.71 | 2,178,684.24 | 2,283,139.46 | 2,546,386.22 | 2,994,626.27 | 2,849,484.57 |
| | | | | | | | | | | | | |
| Royalty Rate | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| Total Royalty Due | 19,107.95 | 19,578.10 | 27,245.42 | 22,208.79 | 20,125.95 | 23,381.89 | 28,826.64 | 21,786.84 | 22,831.39 | 25,463.86 | 29,946.26 | 28,494.85 |
| | | | | | | | | | | | | |
| Payments To: | Royalties due Q1 | | 65,931.48 | Royalties due Q2 | | 65,716.63 | Royalties due Q3 | | 73,444.87 | Royalties due Q4 | | 83,904.97 |
| Univ of TX - Austin | | | | | | | | | | | | |
| Vendor #10248 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Beginning Balance: | (116,143.32) | (135,251.27) | (85,078.22) | 3,819.68 | (18,389.10) | (38,515.06) | (61,896.94) | (90,723.58) | (50,613.48) | (73,444.88) | (98,908.74) | (128,855.00) |
| Royalty Liability | (19,107.95) | (19,578.10) | (27,245.42) | (22,208.79) | (20,125.95) | (23,381.89) | (28,826.64) | (21,786.84) | (22,831.39) | (25,463.86) | (29,946.26) | (28,494.85) |
| Royalty Payments | | 69,751.16 | 116,143.32 | | | | | 61,896.94 | | | | |
| Adjustments | | | | | | | | | | | | 73,444.87 |
| Total Royalty Due | (135,251.27) | (85,078.22) | 3,819.68 | (18,389.10) | (38,515.06) | (61,896.94) | (90,723.58) | (50,613.48) | (73,444.88) | (98,908.74) | (128,855.00) | (83,904.98) |

Prepared by: [signature]     Date: 2/5/2008

Approved by: _____     Date: _____

G:\General Ledger\Financial Reporting FY 2007\Reconciliations07\2007 Royalties\2007 UT Nylon Materials Royalty Accrual
2/5/2008

000050



**SYSTEMS**

May 14, 2008

Mr. Juan M. Sanchez
Vicr President for Research
University of Texas at Austin
MCC Building, Suite 1.9A (R3500)
3925 West Braker Lane
Austin, Texas 78759

Mr. Sanchez,

Enclosed is the 1st quarter royalties report and payment per the license agreement dated
December 7, 1987, as amended between DTM Corporation, (subsequently acquired by 3D)
and the University of Texas at Austin.

Summary:

Category 1:  Sales of Nylon based materials:

| Month | Revenue |
|---|---|
| January-08 | $ 2,164,740.66 |
| February-08 | 2,108,965.25 |
| March-08 | 2,786,645.15 |
| | $ 7,060,351.06 |
| Royalty Rate per Dollar | 1% |
| Royalty due on Nylon Materials | $ 70,603.52 |

Category 2:  Sales of Systems based on identified technology:

| | |
|---|---|
| January-08 | $ 1,180,983.15 |
| February-08 | 235,382.59 |
| March-08 | 1,158,846.97 |
| | $ 2,575,212.72 |
| Royalty Rate per Dollar | 4% |
| Royalty due on Nylon Materials | 103,008.51 |

Total Royalties due for the 1st Quarter 2008           $173,612.03

Summary sales reports from 3D's Oracle ® system is included as supporting
documentation.  Please call with any questions to David B. Ellis at (803) 326-4621,
or e-mail @ ELLISD@3DSYSTEMS.COM

Regards,

David B. Ellis
Senion Financial Analyst
3D Systems, Corp.

Attachments:    Royalty Payment
                Summary sales data for Nylon Materials and Systems
                Summary of royalty calculation for above listed revenues

3D Systems, Inc.
UT Nylon Materials Royalty Accrual
March 31, 2008

| Period | 1 | 2 | 3 |
|---|---|---|---|
| Sales Description | 01/31/08 | 02/29/08 | 03/31/08 |
| US | 576,477.97 | 416,372.98 | 723,880.98 |
| UK | 243,598.15 | 153,306.89 | 228,971.92 |
| France | 144,798.29 | 252,036.11 | 213,600.93 |
| Germany | 583,434.66 | 449,526.46 | 714,222.98 |
| Italy | 228,933.35 | 112,992.33 | 102,458.91 |
| Spain | - | - | - |
| Hong Kong | 72,825.00 | 18,000.00 | 66,600.00 |
| Japan | 314,673.23 | 706,730.47 | 736,909.43 |
| Total Sales | 2,164,740.66 | 2,108,965.25 | 2,786,645.15 |
| Royalty Rate | 1% | 1% | 1% |
| Total Royalty Due | 21,647.41 | 21,089.65 | 27,866.45 |

Royalties Due Q1     70,603.51

\\us-bur-na01\groups\Accounting\General Ledger\Financial Reporting FY 2008\Reconciliations 2008\2008 Royalties Expense\UT Nylon\2008 UT Nylon Materials Royalty Accrual UPDATED
5/14/2008

000052



**SYSTEMS**

December 23, 2008

Mr. Juan M. Sanchez
Vice President for Research
University of Texas at Austin
MCC Building, Suite 1.9A (R3500)
3925 West Braker Lane
Austin, Texas 78759

Mr. Sanchez,

Enclosed is the 2nd and 3rd quarters 2008 royalties report per the license agreement dated
December 7, 1987, as amended between DTM Corporation, (subsequently acquired by 3D),
and the University of Texas at Austin.

<u>Summary:</u>
Category 1:  Sales of Nylon based materials:

| Month | Revenue |
|---|---|
| April-08 | $ 618,315.00 |
| May-08 | 652,003.90 |
| June-08 | 595,009.06 |
| July-08 | 561,921.78 |
| August-08 | 745,978.20 |
| September-08 | 578,943.52 |
| | $ 3,752,171.46 |
| Royalty Rate per Dollar | 1% |
| Royalty due on Nylon Materials | $ 37,521.72 |

Category 2:  Sales of Systems based on identified technology:

|  | (A) <u>March-08 Correction</u> | | |
|---|---|---|---|
| | Proper Amount | $ 1,377,996.97 | |
| | Originally Reported | 1,158,846.97 | |
| | Additional Revenue | | $ 219,150.00 |
| | April-08 | | 988,101.84 |
| | May-08 | | 288,425.00 |
| | June-08 | | 1,816,396.64 |
| | July-08 | | 9,789.81 |
| | August-08 | | 26,893.77 |
| (B) | September-08 | | 1,436,193.69 |
| | | | $ 4,784,950.75 |
| | Royalty Rate per Dollar | | 4% |
| | Royalty due on Nylon Materials | | 191,398.03 |

Total Royalties due for the 2nd and 3rd Quarters 2008            228,919.75

( C )        Prior Nylon Overpayment from February 2003 - March 2008    (765,815.70)
             Overpayment amount as of September 30, 2008  $       (536,895.95)

(A) The originally reported amount and proper amount were different in Mar-08.

(B) Starting in CY 2008, refurbished units were recorded separately.
     $1.4M includes Jan-Sept 08 refurb units and Sept-08 new unit sales.

( C ) As detailed in letter from Keith Roberson.

Summary sales reports from 3D's Oracle ® system are included as supporting
documentation.  Please call with any questions to David B. Ellis at (803) 326-4621,
or e-mail @ ELLISD@3DSYSTEMS.COM

Regards,

David B. Ellis
Senior Financial Analyst
3D Systems, Corp.

Attachments:    Summary sales data for Nylon Materials and Systems
                Summary of royalty calculation for above listed revenues

3D Systems, Inc.
UT Nylon Materials Royalty Accrual
January 1 - September 30, 2008

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Sales Description | 01/31/08 | 02/29/08 | 03/31/08 | 04/30/08 | 05/31/08 | 06/30/08 | 07/31/08 | 08/31/08 | 09/30/08 |
| US | 544,008.97 | 406,582.98 | 685,621.88 | 618,315.00 | 652,003.90 | 595,009.06 | 561,921.78 | 745,978.20 | 578,943.52 |
| Total Sales | 544,008.97 | 406,582.98 | 685,621.88 | 618,315.00 | 652,003.90 | 595,009.06 | 561,921.78 | 745,978.20 | 578,943.52 |
| Royalty Rate | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| Total Royalty Due | 5,440.09 | 4,065.83 | 6,856.22 | 6,183.15 | 6,520.04 | 5,950.09 | 5,619.22 | 7,459.78 | 5,789.44 |

Royalties Due Q1    16,362.14          Royalties Due Q2    18,653.28          Royalties Due Q3    18,868.44

3D Systems Corp

UT Nylon Revenue for Royalty Calculation
January 1 - October 31, 2008

| Name | US | US | US | US | US | US | US | US | US |
|---|---|---|---|---|---|---|---|---|---|
| Category | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 |
| Period | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 |
| Frequency | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd |
| Application | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL |
| **Hyperion Acct #** | | | | | | | | | |
| Nylon | PSS_220 | PSS_220 | PSS_220 | PSS_220 | PSS_220 | PSS_220 | PSS_220 | PSS_220 | PSS_220 |
| Duraform PA/GF/HST | PSS_2201 | PSS_2201 | PSS_2201 | PSS_2201 | PSS_2201 | PSS_2201 | PSS_2201 | PSS_2201 | PSS_2201 |
| Duraform EX/EX Black | PSS_2202 | PSS_2202 | PSS_2202 | PSS_2202 | PSS_2202 | PSS_2202 | PSS_2202 | PSS_2202 | PSS_2202 |
| | | | | | | | | | |
| **Nylon** | - | - | | | - | | - | | - |
| Duraform PA/GF/HST | 379,422.47 | 322,770.98 | 602,846.88 | 435,751.00 | 512,090.40 | 502,393.06 | 399,143.78 | 673,172.20 | 466,491.52 |
| Duraform EX/EX Black | 164,586.50 | 83,812.00 | 82,775.00 | 182,564.00 | 139,913.50 | 92,616.00 | 162,778.00 | 72,806.00 | 112,452.00 |
| Total | 544,008.97 | 406,582.98 | 685,621.88 | 618,315.00 | 652,003.90 | 595,009.06 | 561,921.78 | 745,978.20 | 578,943.52 |
| | | | | | | | | | |
| Rate | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| Gross Royalty Due | $ 5,440.09 | $ 4,065.83 | $ 6,856.22 | $ 6,183.15 | $ 6,520.04 | $ 5,950.10 | $ 5,619.22 | $ 7,459.79 | $ 5,789.44 |

\\us-bur-na01\groups\accounting\General Ledger\Financial Reporting FY 2008\Reconciliations 2008\2008 Royalties Expense\UT Nylon and Vanguard\UT Nylon\2008 UT Nylon Materials Royalty Accrual after Review

000055

**3D Systems, Inc.**
**UT Vanguard Royalty Accrual**
**January 1 - September 30, 2008**

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Sales Description | 01/31/08 | 02/28/08 | 03/31/08 | 04/30/08 | 05/31/08 | 06/30/08 | 07/31/08 | 08/31/08 | 09/30/08 |
| US & Hong Kong | 2,500 | 228,896 | 222,425 | 836,481 | 288,425 | 582,542 | (1,500) | - | 1,500 |
| Japan | 4,553 | 6,487 | | - | | 851,172 | - | - | 580,758 |
| Europe | 1,173,930 | - | 1,155,572 | 151,620 | - | 382,683 | 11,290 | 26,894 | 608,835 |
| Refurbished Systems | | | | | | | | | 245,100 |
| Jan-Sept 2008 | | | | | | | | | |
| Total Sales | 1,180,983.15 | 235,382.59 | 1,377,996.97 | 988,101.84 | 288,425.00 | 1,816,396.64 | 9,789.81 | 26,893.77 | 1,436,193.69 |
| Royalty Rate | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| Total Royalty Due: | (47,239.33) | (9,415.30) | (55,119.88) | (39,524.07) | (11,537.00) | (72,655.87) | (391.59) | (1,075.75) | (57,447.75) |

|  | (A) |  |  | (B) |
|---|---|---|---|---|
| Royalties due Q1 | (111,774.51) | Royalties due Q2   (123,716.94) | Royalties due Q3 | (58,915.09) |

(A) Originally reported as $3,275 but should have been $222,425

(B) Starting in calendar year 2008, refurbished sales were recorded with their own G/L account number.  Jan - Sept 08 sales amounted to $245,100.

2007 UT Vanguard        \\us-bur-na01\groups\accounting\General Ledger\Financial Reporting FY 2008\Reconciliations 2008\2008 Royalties Expense\UT Nylon and Vanguard\UT Vanguard\2008 UT SLS Royalty Accrual

000056

3D Systems Corporation
UT Vanguard Revenue for Royalty Calculation - NEW
January 1 - September 30, 2008

| | | | | us Jan-08 | us Feb-08 | us Mar-08 | us Apr-08 | us May-08 | us Jun-08 | us Jul-08 | us Aug-08 | us Sep-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month------------------> | | | | | | | | | | | |
| PSS_115 | SLS Hi Q | Income | Machines | 2,500 | 228,896 | 271,425 | 285,530 | 288,425 | 582,542 | (1,500) | | 1,500 |
| PSS_156 | SLS Hi Q HS | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_120 | SLS Vanguard US | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_153 | SLS Laserform Oven | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_126 | SLS Pro 140 230 Accessories | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_124 | SLS Pro 70 Accessories | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_117 | SLS Sinterstation 2000 | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_130 | SLS Sinterstation 2000 US | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_135 | SLS Sinterstation 2500 | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_116 | SLS Sinterstation 2500 Plus | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_125 | SLS Sinterstation 2500 Plus US | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_122 | SLS Sinterstation Pro 140 | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_123 | SLS Sinterstation Pro 230 | Income | Machines | - | - | (49,000) | 550,951 | - | - | - | | - |
| PSS_121 | SLS Sinterstation Pro 70 | Income | Machines | - | - | - | - | - | - | - | | - |
| | SLS systems sales | | | $ 2,500 | $ 228,896 | $ 222,425 | $ 836,481 | $ 288,425 | $ 582,542 | $ (1,500) | $ - | $ 1,500 |

| | | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year | | | | | | | | | |
| | Period | 1/31/2008 | 2/28/2008 | 3/31/2008 | 4/30/2008 | 5/30/2008 | 6/30/2008 | 7/31/2008 | 8/31/2008 | 9/30/2008 |
| | Frequency | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd |
| | Application | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL |
| | Entity | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope |
| | Units | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |

Sales $   Q:\HypSE\RetrieveSE.xla'IHPVAL(B$6,B$1,$A7,B$2,B$3,B$4)/UNITS

| | | | | 3deurope Jan-08 | 3deurope Feb-08 | 3deurope Mar-08 | 3deurope Apr-08 | 3deurope May-08 | 3deurope Jun-08 | 3deurope Jul-08 | 3deurope Aug-08 | 3deurope Sep-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month------------------> | | | | | | | | | | | |
| PSS_115 | SLS Hi Q | Income | Machines | 218,744 | - | 634,022 | 28,747 | - | - | 300 | | 624,786 |
| PSS_156 | SLS Hi Q HS | Income | Machines | (0) | - | - | - | - | - | - | | - |
| PSS_120 | SLS Vanguard US | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_153 | SLS Laserform Oven | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_126 | SLS Pro 140 230 Accessories | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_124 | SLS Pro 70 Accessories | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_117 | SLS Sinterstation 2000 | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_130 | SLS Sinterstation 2000 US | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_135 | SLS Sinterstation 2500 | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_116 | SLS Sinterstation 2500 Plus | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_125 | SLS Sinterstation 2500 Plus US | Income | Machines | - | - | - | - | - | - | - | | - |
| PSS_122 | SLS Sinterstation Pro 140 | Income | Machines | - | - | 521,550 | 122,873 | - | - | - | 26,894 | 19,974 |
| PSS_123 | SLS Sinterstation Pro 230 | Income | Machines | 955,186 | - | - | - | - | 382,683 | 10,990 | | (35,925) |
| PSS_121 | SLS Sinterstation Pro 70 | Income | Machines | - | - | - | - | - | - | - | | - |
| | SLS systems sales | | | $ 1,173,930 | $ - | $ 1,155,572 | $ 151,620 | $ - | $ 382,683 | $ 11,290 | $ 26,894 | $ 608,835 |

\\us-bur-na01\groups\accounting\General Ledger\Financial Reporting FY 2008\Reconciliations 2008\2008 Royalties Expense\UT Nylon and Vanguard\UT Vanguard\2008 UT SLS Royalty Accrual
Page 1 of 2

000057

3D Systems Corporation
UT Vanguard Revenue for Royalty Calculation - NEW
January 1 - September 30, 2008

| | | | | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | | | 1/31/2008 | 2/28/2008 | 3/31/2008 | 4/30/2008 | 5/31/2008 | 6/30/2008 | 7/31/2008 | 8/31/2008 | 9/30/2008 |
| | Period | | | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd |
| | Frequency | | | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL |
| | Application | | | jpn | jpn | jpn | jpn | jpn | jpn | jpn | jpn | jpn |
| | Entity | | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| | Units | | | | | | | | | | | |
| Sales $ | Q:\HypSE\RetrieveSE.xla'!HPVAL(B$6,B$1,$A7,B$2,B$3,B$4)/UNITS | | | | | | | | | | | |
| | Month----------------> | | | jpn | jpn | jpn | jpn | jpn | jpn | jpn | jpn | jpn |
| | | | | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 |
| PSS_115 | SLS Hi Q | Income | Machines | 4,553 | 6,487 | - | - | - | 851,172 | - | - | - |
| PSS_156 | SLS Hi Q HS | Income | Machines | - | - | - | - | - | - | - | - | 580,758 |
| PSS_120 | SLS Vanguard US | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_153 | SLS Laserform Oven | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_126 | SLS Pro 140 230 Accessories | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_124 | SLS Pro 70 Accessories | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_117 | SLS Sinterstation 2000 | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_130 | SLS Sinterstation 2000 US | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_135 | SLS Sinterstation 2500 | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_116 | SLS Sinterstation 2500 Plus | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_125 | SLS Sinterstation 2500 Plus US | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_122 | SLS Sinterstation Pro 140 | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_123 | SLS Sinterstation Pro 230 | Income | Machines | - | - | - | - | - | - | - | - | - |
| PSS_121 | SLS Sinterstation Pro 70 | Income | Machines | - | - | - | - | - | - | - | - | - |
| | SLS systems sales | | | $ 4,553 | $ 6,487 | $ - | $ - | $ - | $ 851,172 | $ - | $ - | 580,758 |
| | | | | $ 1,180,983 | $ 235,383 | $ 1,377,997 | $ 988,102 | $ 288,425 | $ 1,816,397 | $ 9,790 | $ 26,894 | $ 1,191,094 |

\\us-bur-na01\groups\accounting\General Ledger\Financial Reporting FY 2008\Reconciliations 2008\2008 Royalties Expense\UT Nylon and Vanguard\UT Vanguard\2006 UT SLS Royalty Accrual
Page 2 of 2

000058

3D Systems Corporation
UT Vanguard Revenue for Royalty Calculation - Refurbished
January 1 - October 31, 2008

| | | | | us Jan-08 | us Feb-08 | us Mar-08 | us Apr-08 | us May-08 | us Jun-08 | us Jul-08 | us Aug-08 | us Sep-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSS_161 | SLS Hi Q Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 245,100 | 0 | 0 |
| PSS_1611 | SLS Hi Q HS Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1612 | SLS Sinterstation Pro 140 Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1613 | SLS Sinterstation Pro 230 Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | SLS systems sales | | | $      - | $      - | $      - | $      - | $      - | $      - | $ 245,100 | $      - | $      - |

| | | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 |
| | Period | 1/31/2008 | 2/28/2008 | 3/31/2008 | 4/30/2008 | 5/30/2008 | 6/30/2008 | 7/31/2008 | 8/31/2008 | 9/30/2008 |
| | Frequency | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd |
| | Application | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL |
| | Entity | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope | 3deurope |
| | Units | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |

Sales $    Q:\HypSE\RetrieveSE.xla'!HPVAL(B$6,B$1,$A7,B$2,B$3,B$4)/UNITS

| | | | | 3deurope Jan-08 | 3deurope Feb-08 | 3deurope Mar-08 | 3deurope Apr-08 | 3deurope May-08 | 3deurope Jun-08 | 3deurope Jul-08 | 3deurope Aug-08 | 3deurope Sep-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSS_161 | SLS Hi Q Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1611 | SLS Hi Q HS Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1612 | SLS Sinterstation Pro 140 Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1613 | SLS Sinterstation Pro 230 Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | SLS systems sales | | | $      - | $      - | $      - | $      - | $      - | $      - | $      - | $      - | $      - |

| | | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 | 2008 |
| | Period | 1/31/2008 | 2/28/2008 | 3/31/2008 | 4/30/2008 | 5/31/2008 | 6/30/2008 | 7/31/2008 | 8/31/2008 | 9/30/2008 |
| | Frequency | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd | m.mtd |
| | Application | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL | DEVEL |
| | Entity | jpn | jpn | jpn | jpn | jpn | jpn | jpn | jpn | jpn |
| | Units | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |

Sales $    Q:\HypSE\RetrieveSE.xla'!HPVAL(B$6,B$1,$A7,B$2,B$3,B$4)/UNITS

| | | | | jpn Jan-08 | jpn Feb-08 | jpn Mar-08 | jpn Apr-08 | jpn May-08 | jpn Jun-08 | jpn Jul-08 | jpn Aug-08 | jpn Sep-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSS_161 | SLS Hi Q Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1611 | SLS Hi Q HS Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1612 | SLS Sinterstation Pro 140 Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PSS_1613 | SLS Sinterstation Pro 230 Refurbished | Income | Machines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | SLS systems sales | | | $      - | $      - | $      - | $      - | $      - | $      - | $      - | $      - | $      - |
| | Aggegate | | | $      - | $      - | $      - | $      - | $      - | $      - | $ 245,100 | $      - | $      - |

000059



OFFICE OF TECHNOLOGY COMMERCIALIZATION

THE UNIVERSITY OF TEXAS AT AUSTIN

*MCC Building Mail Code R3500 3925 W. Braker Lane, Ste 1.9A • Austin, TX 78759*
*(512) 471-2995 • FAX (512) 475-6894 • www.otc.utexas.edu*

March 2, 2009

**By Certified Mail, Return Receipt requested and E-mail**

Mr. Keith A. Roberson
Intellectual Property and Technology Counsel
3D Systems Corporation
333 Three D Systems Circle
Rock Hill, South Carolina 29730

Re:   *The February 28, 2003 Amendment (**2003 Amendment**) and the December 3, 1987
      License Agreement between 3D Systems Corporation and the Board of Regents of the
      University of Texas System (**License Agreement**)*

Dear Mr. Roberson:

    We are writing on behalf of the Board of Regents of the University of Texas System
(the **Board**) in response to your December 23, 2008 letter.

    We recognize you did not participate in the negotiations that surrounded the 2003
Amendment between 3D Systems Corporation (**3D Systems**) and the Board.  A bit of history
is, therefore, in order.  Implicit in your letter is the understanding that the arrangement
regarding the Nylon Patents (defined in section 5.11 of the 2003 Amendment) is the typical
one under which a *patentee/licensor* (the Board) holds a patent and grants a licensee rights to
that patent in exchange for periodic payments.  Without the license, the licensee would
infringe the *licensor's* patent or at least be at risk of an infringement claim.  The arrangement
regarding the Nylon Patents, however, is different.

    The Nylon Patents are held by *3D Systems*, not the Board.  Well before the 2003
Amendment, we learned that 3D Systems' materials were identical to those developed at the
University of Texas at Austin (**UT**).  Accompanying this letter is Brian K. Service's October
15, 2002 letter to Dr. Juan Sanchez in which he points out the pending controversy regarding
"UT's claims of inventorship to certain 3D patents" and recounts the parties' recent
conversations that "focused on the inventorship of U.S. Patent No. 6,136,948," one of the
Nylon Patents.



EXHIBIT
**F**

000060

This is the issue that was on the table at the time of the 2003 Amendment. Thus, unlike an ordinary license under which 3D Systems would pay royalties to fend off a possible infringement claim, here 3D Systems was bound to pay in order to avoid being stripped of the Nylon Patents. Because the Nylons Patents *and the materials themselves* were traceable to UT, 3D Systems agreed to pay royalties on all sales involving Nylon Materials, not just those within the United States.

As for section 5.14(a) of 2003 Amendment, which you highlight in your letter, this provision does not define *geographic* limitations on 3D Systems' obligations; rather, it specifies the *time period* over which 3D Systems will pay royalties:

> 3D Systems will pay Section 5.9 royalties to Board for the **term of the following patents**: U.S. Patents Nos. 5,342,919; 5,648,450; 5,990,268; and 6,136,948. . . . (emphasis added).

It is as disappointing as it is insupportable for 3D Systems to claim that it "has been overpaying royalties since February 2003," when the 2003 Amendment was executed. These payments were not errors, but instead acknowledgments of the company's obligations (specifically recognition by those at 3D Systems who were involved in the negotiations, understood the company's pledge, and stood ready to honor it). If the 2003 Amendment can be strained to your reading, this history is ample rebuttal. *See Imco Oil & Gas Co. v. Mitchell Energy Corp.*, 911 S.W.2d 916, 921 (Tex. App. — Fort Worth 1995, no writ) ("the conduct of the parties which indicates the construction that the parties themselves placed on the contract may be considered as evidence of their true intent"); *Page v. Superior Stone Products, Inc.*, 412 S.W.2d 660, 664 (Tex. Civ. App. — Austin 1967, writ ref'd n.r.e.) ("If a contract is ambiguous, or susceptible of dual meanings, the construction given the contract by the parties and *their actions under the contract, before any controversy arose as to its meaning, with knowledge of its terms, will be adopted and enforced by the courts when reasonable*") (emphasis added).

We are troubled that, after a long history of working together cooperatively, 3D Systems has taken this plainly incorrect position and done so without even a call beforehand to sort through your (mis)understanding of the 2003 Amendment. In view of 3D Systems' abrupt default on its royalty obligations under section 5.9 of the Amendment and its repudiation of that obligation, the Board hereby gives notice of default under section 7.2 of the License Agreement. Additionally, the Board demands that 3D Systems timely comply

March 2, 2009   Page 3

with its audit obligations under section 5.6 under the License Agreement (as amended in section 8 of the 2003 Amendment).

If you have any questions or otherwise wish to discuss this matter, please call.

Very truly yours,

Richard Friedman
Associate Director, Licensing

000062

October 15, 2002

Office of Technology Licensing
and Intellectual Property

OCT 2 2 2002



**_VIA_ HAND DELIVERY**

Dr. Juan M. Sanchez
Vice President for Research
Assistant Vice President for Research
The University of Texas, Austin
Main Building 302
P.O. Box 7996
Austin, Texas  78712

Dear Dr. Sanchez:

Wally Loewenbaum and I would like to thank you for the candid and productive meeting on Thursday, September 19th, regarding a range of issues that involve both The University of Texas, Austin ("UT") and 3D Systems, Inc. ("3D").  Your clear statement of objectives at the start of the meeting, namely (i) to protect the patent in question, and (ii) to do whatever UT can do to support its Licensee in the current litigation, was very welcome and set the stage for very productive discussions. For our part, we confirm that 3D will be responsive to the obligations to UT under the license agreement.  Further, we will provide to UT all documents in our possession related to UT's claims of inventorship of certain 3D patents.  In addition we appreciated your clear statement on the resolution of the inventorship issue, namely, that once we are dealing with the same information, a rational examination by someone that both UT and 3D trust would be sufficient for both of us to resolve open issues.

Our discussions on September 19th focused on the inventorship of U.S. Patent No. 6,136,948 ("the '948 Patent").  We understand that 3D and UT may have other differences to resolve, but this communication is limited to the inventorship of the '948 Patent. Following our productive discussions, this letter agreement is intended to confirm and document the following matters to which UT and 3D have agreed:

1.      UT and 3D, as parties to the December 3, 1987 Patent License Agreement between the Board of Regents, The University of Texas System as Licensor and Nova Automation Corporation as Licensee, as that agreement has been modified (the "License Agreement"), affirm their duty of cooperation under the License Agreement and intend that their contractual relationship henceforth incorporate a duty of good faith and fair dealing towards one another.

2.      UT and 3D acknowledge that there currently exists a dispute by UT concerning the inventorship claims of Dr. Carl Deckard to U.S. Patent No. 6,136,948 (the "948 Patent") and that 3D has identified concerns about the validity of the '948 Patent.  In order to optimize the value of the '948 Patent to both parties, UT and 3D agree as follows:

26081 Avenue Hall

Valencia, CA 91355 USA

661.295.5600

661.257.1200 (fax)

www.3dsystems.com

- 1 -

000063

a.      Any questions concerning validity of the '948 Patent will be addressed and resolved by 3D first (such as, without limitation, seeking a reissue of the '948 Patent from the U.S. Patent and Trademark Office). 3D confirms that, because of its concerns regarding the nylon claims in the '948 Patent, it has withdrawn this patent from its infringement action against EOS and intends to seek a re-examination or reissue of this patent. 3D and UT will cooperate to address and resolve the '948 Patent validity concerns in order to best preserve the patent and to protect the rights of both 3D and UT.

b.      After the conclusion of the pending EOS v. DTM/3D U.S. litigation, 3D and UT will promptly exchange or make available to each other copies of all documents in the parties' possession, custody or control relating to the inventorship of the '948 Patent, including all prosecution files of the patents, determination opinions, interviews of knowledgeable people and investigations regarding inventorship and the '948 Patent. 3D will also provide to UT pleadings, depositions and court documents in the current litigation with EOS relevant to inventorship. 3D is under no obligation to prepare or find documents not in its possession, custody or control. If UT so wishes, and at times not inconvenient to 3D, UT may interview persons knowledgeable and 3D will cooperate in making such persons available.

c.      Once validity concerns about the '948 Patent have been addressed and resolved and information relating to inventorship has been provided , UT and 3D will then immediately resolve any pending inventorship claim to the '948 Patent. UT and 3D will first attempt in good faith to resolve any differences. Failing resolution of all differences, issues in dispute will be identified in writing and will be addressed in a mediation proceeding. The parties intend the mediation to be non-binding and evaluative, resulting in the issuance of an opinion concerning the inventorship claim. It will be conducted by an acceptable expert knowledgeable and skilled in U.S. Patent law, and who has been mutually agreed to by UT and 3D. Both parties will cooperate in making available all evidence relevant to the inventorship claim. The parties also acknowledge that no undertakings or assurances can be given, and none are presumed, with regard to any independent actions that might in the future be taken by Dr. Deckard regarding the '948 Patent.

3.      UT and 3D recognize 3D is presently involved in litigation with EOS GmbH Electro Optical Systems and EOS North America, Inc. (collectively, "EOS"), and that it is in the best interests of both parties to work together on matters relating to the EOS litigation. Accordingly, UT agrees not to provide any assistance to or to cooperate with EOS or its counsel in EOS's litigation efforts against 3D, and not to interfere with 3D's litigation efforts against EOS, including without limitation 3D's relationship with outside consultants. With respect to EOS litigation, UT and 3D further agree as follows:

a.      Without imposing any specific obligation to do so, joint litigation efforts by UT and 3D and the sharing of information relating to those efforts shall be protected by the attorney-client privilege, the work product privilege and any other privilege that may otherwise apply. Neither UT nor 3D intends to waive any privilege that may apply to such communications and joint efforts.

000064

b.       Joint litigation efforts shall be kept confidential.  In the event that either UT or 3D is served with or becomes subject to legal process seeking production of or testimony pertaining to their joint litigation efforts, the party from whom the information is sought shall promptly inform the other party and take all steps reasonable and necessary to protect the confidential and privileged nature of joint litigation efforts.

c.       Any communications between UT and 3D relating to the subject matter of 3D's litigation with EOS that have occurred before the date of this agreement, including the parties' communications concerning validity and inventorship issues relating to the '948 Patent, shall constitute joint litigation efforts and shall be subject to the confidentiality and privileges accorded those efforts under this agreement.

d.       This agreement does not prevent UT or 3D from disclosing to third parties any materials or information that (a) have become publicly available other than through disclosure in violation of this agreement, (b) became known to the disclosing party other than through joint litigation efforts, or (c) were originated by the disclosing party and do not incorporate information learned from the other party through joint litigation efforts.

We both recognize potential other items of differences between 3D and UT, and we both intend to resolve these issues in a business like manner.

If this letter accurately sets forth our understanding, please acknowledge UT's agreement by countersigning in the space provided below.

Yours sincerely,

Brian K. Service
Chief Executive Officer

ACKNOWLEDGED and AGREED:

THE UNIVERSITY OF TEXAS AT AUSTIN

Dr. Juan M. Sanchez

10/18/02

000065

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Keith A. Roberson
3D Systems Corporation
333 Three D Systems Circle
Rock Hill, South Carolina 29730

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Rose Ganyard_   ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
Rose Ganyard   3/5/09

D. Is delivery address different from Item 1?   ☐ Yes
If YES, enter delivery address below:   ☑ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7003 3110 0000 1926 6544

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

000066



# SYSTEMS

June 1, 2010

RECEIVED
JUN 16 2010
Technology Commercialization

Mr. Juan M. Sanchez
Vice President for Research
University of Texas at Austin
MCC Building, Suite 1.9A (R3500)
3925 West Braker Lane
Austin, Texas 78759

Mr. Sanchez,

Enclosed are the April 2008 to March 2010 royalty report per the license agreement dated
December 7, 1987, as amended between DTM Corporation, (subsequently acquired by 3D Systems),
and the University of Texas at Austin.

Summary:
Category 1:  Sales of Nylon based materials:

| Month | Revenue |
|---|---|
| April-08 | $ 618,315.00 |
| May-08 | 652,003.90 |
| June-08 | 595,009.06 |
| July-08 | 561,921.78 |
| August-08 | 745,978.20 |
| September-08 | 578,943.52 |
| October-08 | 700,879.87 |
| November-08 | 423,874.13 |
| December-08 | 408,502.54 |
| January-09 | 538,541.57 |
| February-09 | 342,268.42 |
| March-09 | 505,264.73 |
| April-09 | 614,453.41 |
| May-09 | 395,202.73 |
| June-09 | 635,688.58 |
| July-09 | 536,028.68 |
| August-09 | 513,431.32 |
| September-09 | 563,870.20 |
| October-09 | 593,948.43 |
| November-09 | 539,089.25 |
| December-09 | 561,682.60 |
| January-10 | 504,080.19 |
| February-10 | 530,148.01 |
| March-10 | 499,225.94 |
| | $ 13,158,352.06 |
| Royalty Rate per Dollar | 1% |
| Royalty due on Nylon Materials | $    131,583.53 |

EXHIBIT

**G**

3D Systems Corporation   •   333 Three D Systems Circle   •   Rock Hill, SC 29730   •   USA
Phone: +1 803.326.3900   •   Fax: +1 803.324.4311   •   www.3dsystems.com   •   NASDAQ: TDSC

000067



# SYSTEMS

Category 2:  Sales of Systems

|  |  |  |  |
|---|---|---|---|
| (A) | March-08 Correction | | |
| | Proper Amount | $ 1,377,996.97 | |
| | Originally Reported | 1,158,846.97 | |
| | Additional Revenue | | $ 219,150.00 |
| | April-08 | | 988,101.84 |
| | May-08 | | 288,425.00 |
| | June-08 | | 1,816,396.64 |
| | July-08 | | 9,789.81 |
| | August-08 | | 26,893.77 |
| (B) | September-08 | | 1,436,193.69 |
| | October-08 | | 576,939.38 |
| | November-08 | | - |
| | December-08 | | 3,859,600.38 |
| | January-09 | | - |
| | February-09 | | - |
| | March-09 | | 313,510.00 |
| | April-09 | | 1,200.00 |
| | May-09 | | 128,362.40 |
| | June-09 | | 1,007,669.72 |
| | July-09 | | - |
| | August-09 | | - |
| | September-09 | | - |
| | October-09 | | - |
| | November-09 | | - |
| | December-09 | | - |
| | January-10 | | - |
| | February-10 | | - |
| | March-10 | | - |
| | | | $ 10,672,232.63 |
| | Royalty Rate per Dollar | | 4% |
| | Royalty due on Systems | | 426,889.31 |

Total Royalties earned as of March 31, 2010.                                                     **558,472.84**

| | | | |
|---|---|---|---|
| ( C ) | Prior Nylon Overpayment from February 2003 - March 2008 | (765,815.70) |
| ( D ) | Overpayment amount as of March 31, 2010 | $ **(207,342.86)** |

3D Systems Corporation   •   333 Three D Systems Circle   •   Rock Hill, SC 29730   •   USA
Phone: +1 803.326.3900   •   Fax: +1 803.324.4311   •   www.3dsystems.com   •   NASDAQ: TDSC

000068



**SYSTEMS**

(A) The originally reported amount and proper amount were different in Mar-08.

(B) Starting in CY 2008, refurbished units were recorded separately.
   $1.4M includes Jan-Sept 08 refurb units and Sept-08 new unit sales.

( C ) As detailed in letter from Keith Roberson dated December 23, 2008.

( D ) 3D Systems reserves all rights with respect to the calculations
   contributing to the amounts reported herein.

Summary sales reports from 3D's Oracle ® system are included as supporting
documentation.  Please call with any questions to David B. Ellis at (803) 326-4621,
or e-mail @ ELLISD@3DSYSTEMS.COM

Best Regards,

David B. Ellis
Senior Financial Analyst
3D Systems, Corp.

Attachments:      Summary sales data for Nylon Materials and Vanguard Systems
                  Summary of royalty calculation for above listed revenues

# Tab B

STATE OF TEXAS      §
TRAVIS COUNTY       §

## AFFIDAVIT OF LINDA SHAUNESSY

Before me, the undersigned notary, on this day personally appeared Linda Shaunessy, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1.      "My name is  Linda Shaunessy. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.       I am an Assistant Attorney General and the attorney of record for plaintiffs  and counter-defendants Board of Regents of the University of Texas System and the University of Texas at Austin (collectively "UT").

3.      Attached in the Appendix to this Motion to Dismiss is a true and correct copy of the Petition and exhibits filed in the state court action styled:  *Board of Regents of the University of Texas System and the University of Texas at Austin v. 3D Systems, Inc.,* Cause No. D-1-GN-10-003599, In the District Court of Travis County, 53rd Judicial District."

Further Affiant sayeth not.

_Linda Shaunessy_
Linda Shaunessy
Assistant Attorney General

Sworn and subscribed before me by _Linda Shaunessy_ on December 6, 2010.

LAURA JANE EDWARDS
Notary Public
STATE OF TEXAS
Commission Exp. 05-17-2012
Notary without Bond

_Laura Jane Edwards_
Notary Public in and for the State of Texas

My commission expires: _May 17, 2012_